# Charleston.

HENRY G. DAVIS *et al.* vs. EUGENE HENRY.

January Term, 1871.

1. On a bill for the specific performance, it is proper to make a party a defendant to whom an interest in a portion of the purchase money has been assigned. Having an equitable interest he is in a situation to be affected by the decree of the court.

2. Where a party holds an instrument of writing as the mutual friend of both parties, or a deed as an escrow, and refuses to deliver the same, he is a proper party to a bill for a specific performance of the instrument, or the terms of the deed. And if a party thus holding a *quasi* trusteeship does not demur because of his being made a party, it is not for the party against whom the specific performance is sought, to demur.

3. A case in which a contract obtained by misrepresentation, is held unconscionable and fraudulent.

4. Where a contract is clearly fraudulent by reason of misrepresentation, a second contract annulling the first, made whilst under the influence of such misrepresentation, and a repetition thereof, is a continuation of the fraud, and is not a confirmation or condonation of the first fraud, and the court below would have acted properly in rescinding the second contract. Yet as the testimony in this case is not entirely satisfactory, but vague and indefinite as to the fact whether the party was fully informed at the time of making the second contract, that he had been defrauded, and that he intended the second contract to be a distinct transaction of confirmation, the case is remanded to the court below to settle that question by more definite testimony; or, as this is a case in which it would be eminently proper, by an issue out of chancery.

This was a suit in chancery, in the circuit court of Doddridge county, by Henry against Davis and others, the object of which was to enforce against Davis specific performance of a contract for the sale of a tract of land in Doddridge county, by Henry to Davis, and to subject the same to the payment of a large balance of purchase money claimed to be due.

The bill was filed in July, 1866, setting out a contract, made in March, 1865, for the sale of a tract of 313 acres at the price of 100 dollars per acre, payable as therein specified, and also 15,000 dollars of the stock of a company which Davis was to form for the purpose of mining for oil, upon this and adjoining lands. The contract also embraced the sale of an adjoining piece of land of 14 acres, at the price of 20 dollars per acre. The bill alleged that Henry, on faith of this sale, had purchased a tract of land in Harrison county for 10,000 dollars, on the terms therein stated; but that Davis only paid 3,300 dollars of the purchase money he had promised, and made objections to proceeding further with the contract; that Henry was very anxious to perfect the sale, for reasons stated, and much negotiation ensued between him and Davis on the subject; that these negotiations resulted in a new contract, made on the 19th of July, 1865, by which Davis agreed to take the land at 23,300 dollars, instead of the consideration of the former contract, payable as therein provided, and 10 acres of the 14 at 20 dollars per acre; that this contract was reduced to writing, and declared the former to be thereby cancelled and annulled; that Davis paid 10,000 dollars on the new contract, and Henry and wife executed a deed for the land and deposited it as agreed on; that Davis then paid 2,000 dollars more, agreed to be paid on the deposit of the deed, leaving unpaid on the last contract, 8,200 dollars; and proceeded to allege the refusal of Davis to pay this balance, prayed the enforcement of this contract and sale of land, and general relief.

Davis answered the bill in November, 1866. He admitted the contract of the 9th of March, 1865, but alleged that it was obtained from him by Henry by false and fraudulent representations that there was upon the land the mineral known as asphaltum coal; that this coal was the sole inducement for the purchase; that such representations were false; that there was no such mineral on the land, and that Henry knew it when he represented the contrary. He also admitted the contract of the 19th of July, 1865, and alleged that

he made it for the purpose of getting rid of Henry's importunities for money, and that he only agreed to it for the purpose of getting an abatement of 8,000 dollars of the purchase money and the 15,000 dollars of the stock which was to be furnished him under the first contract. He charged that he had fully tested the question whether there was asphaltum coal on the land, and ascertained there was none. He alleged that both the contracts of March 9th, 1865, and July 19th, 1865, were tainted with fraud, and insisted that neither should or would be enforced against him. He admitted that he had not paid the balance of the purchase money claimed to be owed, and that he ought not to be compelled to pay it, for the reason alleged.

After filing this answer, Davis also filed a cross-bill in the cause, setting up the same alleged fraud in falsely alleging the presence of asphaltum coal on the land, and the other matters alleged in his answer, and insisting that both the contract of the 9th of March and that of the 19th of July, were vitiated thereby, and praying the court to rescind the last named contract, and decree that Henry should refund the amount which he had received upon the contract.

Henry answered the cross-bill. He denied all the allegations of fraud which it made. He did not recollect that he ever spoke with Davis about asphaltum coal being on this land, or ever showed him any; but stated that in the days of inflation and excitement in which these contracts were made, rumors were rife of such coal being found anywhere and everywhere. He denied explicitly that the contract of the 19th of July, 1865, was made under the circumstances or for the reasons alleged by Davis; he stated, whatever was the rumors or had been the talk about asphaltum coal prior to this time, Davis had, prior to the 19th of July, 1865, satisfied himself that it was not to be found on this land; that for this reason he had urged Henry to abate the 8,000 dollars and to give up the 15,000 dollars of stock, and promised to pay the balance in a short time; that Davis had then given up all idea of coal on the land, and had gone back to his

original purpose of boring for oil; that he had fully satisfied himself of the mineral value of the land, and agreed that he would take it if Henry would make the abatement proposed, "coal or no coal, oil or no oil." And denying all fraud and wrong whatever in the contract of the 19th of July, he insisted upon its due execution and the relief prayed for in his bill.

To the answers of the three defendants to the original bill, and of the defendant Henry to the cross-bill, replications were filed by the complainants, respectively.

The depositions of very many witnesses were taken by both parties upon the various questions of fact made by the pleadings in the cause.

The causes (on the original and cross-bills), came on to be heard on the 8th of May, 1869, upon the original and cross-bills, the answers thereto respectively, replications to the same, exhibits filed, and the depositions with certain exceptions thereto. Whereupon the court was of opinion that Davis was liable for and should pay the balance of the purchase money due upon the contract of the 19th of July, 1865, which was ascertained to be 8,200 dollars, with interest from the time when the same was made payable, and decreed accordingly; and that a sale of the land should be made on default of the payment thereof, with the costs of suit. The court also dismissed the cross-bill of Davis, with costs.

The contract of the 19th of July, 1865, was endorsed on the paper on which the former contract was written, and was placed in the hands of Benjamin F. Martin, esq., for safe keeping, and it was alleged in the bill that he "gave out in speeches" that he considered Davis was solely interested in it, and that he would surrender it to him if demanded. Martin was made a party defendant to the original bill. The bill also alleged that in pursuance of the second contract the plaintiff and wife executed a deed to Davis, and delivered it to T. K. Knight, who happened then to be clerk of the circuit court of Doddridge county, which fact the latter certified to Davis. That Knight refused to deliver

the deed thus made, to the plaintiff, or to any one, until authorized to do so by the court. He was also made a party defendant. It was further alleged in the bill that the plaintiff had assigned to one Benjamin Wilson, esq., the sum of 800 dollars of the purchase money due from Davis, and the benefit of the contract to the extent of the sum so assigned, and that Wilson held an assignment in writing thereof, and claimed the benefit of the same. He was also made a party defendant.

The depositions taken in the cause were quite voluminous, and in many particulars contradictory. It appeared, however, to be established that the plaintiff represented that he had found or struck a vein of asphaltum coal, from seven to eight feet in thickness, in a well he was boring on the land, for oil, at a depth of about 108 feet; this he represented to several parties, as well as to the defendant, before and at the time of the original contract in March, 1865. It also appeared that the plaintiff had procured some specimens of asphaltum coal, through one Baker, who he employed for the purpose, from an asphaltum mine in Ritchie county, which he told Baker, in the hearing of the witnesses Bee and O'Donnell, he wanted to put about the well he was boring, to enable him to sell his farm; that witness O'Donnell saw at Baker's store, after his return from the Ritchie county mine, some lumps of asphaltum which he had brought home in his carpet sack, and also some small pieces which were brought there by the plaintiff, which he said he got from his well. That defendant Davis had sunk four new wells on the land, and had reamed out the old one bored by Henry, enlarging the latter from a four to a six inch hole, to the depth of three hundred and sixty feet. That three of the new wells were within fourteen inches from the centre of hole bored by Henry, and varied from 129 to 242 feet in depth; that no asphaltum or other coal was discovered, except a small vein resembling bituminous coal of eight or ten inches in thickness, at a depth of about 117 feet. That Henry also stated that he had indications of oil in the well,

and exhibited specimens in a bottle, but none had ever been observed by those who were engaged in boring, except on one occasion when their attention had been called to it by Henry, and none was ever seen afterwards.

The testimony as to the representations of Henry, made to Davis, and in his presence, concerning the finding of asphaltum, and exhibiting specimens alleged to have been so found, was abundant. It was also shown that Henry stated in the presence of witnesses, in April, 1865, that he had told Davis, prior to the consummation of the purchase, that he had discovered while boring for oil, an asphaltum vein of coal from seven to nine feet thick, 108 feet below the surface.

In relation to the annulling of the contract by the renewal or new contract, of July 19th, 1865, the material testimony for Henry, was as follows: John Y. Bassel proved that about the middle of July, 1865, he was at the place where they were boring the wells; they were working a well between three and four hundred feet deep; said they were boring for oil, and when the pumpings were poured out, all present examined for oil indications, defendant Davis, among the rest. Witness understood from Davis and Henry, that they were about to have a law suit about the property, Davis claiming that Henry had misrepresented the property, concerning the valuable mineral deposit of asphaltum; to which Henry replied that there was an existing contract, in which the land and not the coal was stipulated for; but Davis still refused to take the property according to contract, and insisted that "Henry should abate a part of the purchase money, as he had no longer hope of coal, with a fair abatement his chance for oil might relieve him." He understood from the general tenor of their conversation that a compromise was decided upon, and that they were going to Grafton together to settle it.

Israel J. Kinney deposed that, he was deputy sheriff of Doddridge county, in July, 1865; that in June of that year a summons was placed in his hands, in favor of Henry against

Davis; went to serve it in Greenwood, near where the land in controversy lay; saw Davis there, and heard Henry say to him that he would sue him, to which the former replied, that he would prefer not being sued; did not serve the summons, because the parties made a compromise; Davis agreed, as witness recollected, to take the land, "oil or no oil, coal or no coal." Henry instructed witness to return the summons, as the matter was satisfied, and he would pay him the fee of witness. Witness understood this arrangement to take place, but could not state that he heard Davis say anything, but the understanding above related, passed between them.

On this point the defendant introduced the deposition of B. F. Martin, Esq., who stated that some time in the summer of 1865, the parties, Henry and Davis, came to his office, in Pruntytown, Taylor county; they wanted a contract written in respect to the land in controversy; witness wrote it on the back part of the original contract; the contract abated about 8,000 dollars in money and 15,000 dollars in stock, mentioned in the first contract; thought Davis said when they first came to him, that they had agreed on settlement of the controversy between them, or wanted to settle the difficulty; that often before the writing of the second contract, Henry assured Davis, in presence of the witness, and also assured witness, as attorney for Davis, when Davis was not present, that the coal, or asphaltum, would surely be found by Davis, at a distance of 108 feet or thereabouts, beneath the surface; that he also made like assurances to Davis while witness was writing the second contract, *i. e.*, that Davis "would find the coal or asphaltum, at or about the depth aforesaid, if he bored for it." It was proved that Davis continued his operations of boring until December, 1865.

Davis appealed to this court.

Hon. C. J. Stewart, Judge of the circuit court of Doddridge, presided on the hearing of the cause.

*Faulkner* and *Boggess* for the appellants.

*Lee*, *Lewis* and *Edmiston* for the appellee.

Moore, J. The appellant, Henry G. Davis, by his counsel, insists :

1st. That the demurrer to the original bill should have been sustained, because of improper joinder of Wilson and others, with him.

2d. That the original bill should have been dismissed at the costs of complainant, Henry, because of the false and fraudulent representations made by him in relation to the land sold to said Davis.

3d. That the decree in the cross-bill should have cancelled the contract of sale of July 19th, 1865, with costs, and not have dismissed the bill.

4th. That the court ought to have directed an issue, to try by jury, the question of fraud, and whether said Davis had discovered the fraud prior to the 19th July, 1865.

The appellee, Henry, by his counsel, insists :

1st. That the decree is right, both in giving the relief prayed for in the original bill, and in dismissing the cross-bill, with costs.

2d. That the evidence offered by Davis, to prove false and fraudulent representations on the part of Henry, to procure the contract of 9th March, 1865, is insufficient to establish the charge made against him, and that the evidence tending to prove such representations is unworthy of credit.

3rd. That the charge of fraud in the contract of March 9th, 1865, is not supported by the proof in the cause.

4th. That if there had been really any question between Davis and Henry, about representations as to the presence of asphaltum coal on the land sold, previously to the second contract, yet when that contract was made on the 19th July, 1865, it was fully ascertained by Davis that it was not there,

and that contract was made without reference to the presence of such coal on the land.

5th. That said contract was made with reference to mining for oil, the original object of pursuit.

6th. That if there be anything in the evidence, tending to raise the impression of such representation made by Henry on the order of trade and dealings, as ought to be construed by the court to affect the first contract of March 9th, 1865, with fraud, yet that such fraud, if any, was already "condoned" by the second contract of the 19th July, 1865, for a valuable consideration, to wit: an abatement of 8,000 dollars, in cash, of the purchase money, and 15,000 dollars of stock in the company, which Davis was himself to form, for the purpose of working this and adjoining lands.

7th. That it is too late for Davis now to call in question the validity of the contract of July 19th, 1865.

It appears, on inspection of the original bill, that Henry G. Davis, Benjamin Wilson, Benjamin F. Martin, and Taliaferro K. Knight, are made defendants. Davis was the principal defendant, on account of privity in the contract which Henry seeks the specific execution of; Wilson was made a party, because Henry had assigned to him 800 dollars of the money he was to receive from Davis on the contract, "and the benefit of the said contract, to the extent of the said sum so assigned," and said Wilson had forbidden Davis from paying the same to said Henry; Martin was made a party because he had in his possession, as the mutual friend of Henry and Davis, the contract of March 9th, 1865, and July 19th, 1865, which Henry prayed he should be required to produce, and place the same within the control and at the disposal of the court; Knight was made a party because he held, as an escrow, pursuant to the contract of July 19th, 1865, the deed which Henry and wife had made, conveying the land to Davis.

Justice Story, in his admirable work on Equity Pleadings, § 226, b., says, "in the case of a common bill for the spe-

cific performance of a contract of sale of real estate, the only proper parties in general, are the parties to the contract itself; special cases may indeed exist, in which the rule may be otherwise, but they stand upon their own peculiar grounds." In this case, Davis' privity in the contract sought to be enforced, makes him principal defendant. Wilson, by virtue of the assignment made to him, was entitled to the 800 dollars, with the interest due thereon, and having that equitable interest, he was in a situation to be affected by the decision of the court; it was, therefore, proper to make him a party defendant, that he might the more readily protect his equitable interest, which might otherwise be decreed to Henry, who had assigned to him. Wilson had also notified Davis of the assignment, and forwarned him not to pay the 800 dollars to Henry; hence it was essential to Davis' protection that the rights of Wilson, in that respect, should be adjudicated in this cause.

It is also a well settled principle, in equity, that the person having the beneficial interest, is a necessary party, which illustrates "the ordinary doctrine that, the real parties in interest shall be brought before the court, whenever their interests may be affected." Story's Eq. Pl., §§ 153, 154, and notes.

As to Martin and Knight, it is true, they were in one sense simply witnesses, and had they occupied only that relationship, they would not have been proper parties, but they stood in a nearer relationship—a *quasi* trusteeship. Martin had been constituted, as the mutual friend of both Henry and Davis, custodian of both contracts; Knight held as an escrow, the deed which Henry and wife had made to Davis. It was, therefore, their duty to act disinterestedly between Henry and Davis, and in good faith execute impartially the trust confided in them. The bill charged as follows: that "Martin holds said paper-writing, the sole evidence of said contract, in his possession, but gives out in speeches, that he considers the said Davis is solely interested in the same, and that he will surrender the same to

him if he demands it;" that Knight "holds the said deed so deposited with him as aforesaid, and declines to deliver the same, either to your orator or to the said ———, until ordered to do so by the order of your Honor; and the said Davis combines and confederates with other persons, to your orator unknown, to baffle, deceive, and defraud your orator in the premises."

The bill also prayed that said Martin should be required to produce said contracts, and place them within the control, and at the disposal of, the court, and that said Knight be required to produce the deed, so as to be at the disposal of the court. On demurrer, the allegations of the bill are taken as true, and the bill thus showing such inequitable conduct, and the necessity for the production of the contracts and the deed, as proper exhibits in the cause, so essential to the final adjudication thereof, whether the decree should be specific performance or rescission, it seems to me, that viewed from this stand-point, there is such a special case in this instance as equity will embrace, and should sanction the joinder of defendants. For these reasons, and upon the principles laid down in the standard works on equity pleadings, I think there is not such a misjoinder of defendants, in this case, as would have justified the court in allowing the demurrer, and that the court did right in overruling it. Story's Equity Pleadings, sections 221, 229; Mitf. Eq. Pl., side page 162.

Neither Wilson, Martin or Knight demurred; Davis was not the proper person to demur for misjoinder of defendants, and the demurrer was properly overruled for that reason also. Story's Eq. Pl., § 544.

This brings us to the case as it appears on the contracts, and evidence of the manner in which they were obtained. It is argued by appellant that his vendor, the plaintiff in the original bill, by device and false representations, took an unconscientious advantage of him in procuring the contracts; in short, practised positive, actual fraud. If that be true, then the court erred in enforcing the contract, because

it is a well settled principle, that a court of equity will never assist a wrong doer in effectuating his wrongful and illegal purpose, which is the spirit of the maxim, " That he who seeks equity, must do equity." 1 Story's Eq. Jur., § 64, *e.* On the other hand, if the contract was not founded upon false representations, or if Davis assumed to judge for himself, and did not use the means of knowledge within his reach, but entered into the contract through unreasonable negligence or indiscretion, *caveat emptor* applies, and as to him equity closes its doors. *Idem*, § 200, *a.*

Without going into detail, it seems to me the weight of the evidence is against Henry; that he obtained the first contract from Davis through artifice and misrepresentation, is, from the depositions, unquestionable. That it was such a fraud as could not have been detected by any reasonable diligence on the part of Davis, a ruse so studied, and an imposition, though gross, yet so well concealed, was well calculated to deceive the most vigilant and discreet, especially at a time when the wonderful mineral developments of the country were so exciting.

It is clear that Henry, before the making of said contract, had represented, not only to Davis, but to others, that in sinking the well on the land, he had struck, at the depth of 108 or 110 feet, a vein of asphaltum coal of eight or nine feet in thickness. He even exhibited specimens of it to different parties ; sent samples of it to R. W. Lowther, who showed it to Davis; and when Davis and Lowther visited the well, they found small pieces of the coal, similar to the said specimens, scattered about the well, mixed with the borings.

Henry then told them the asphaltum pieces had been "taken out of the well, and that they had struck a vein of the coal at about 108 or 110 feet below the surface, of nine feet in thickness." At the same time he stated to Davis and Lowther, that "they had a show of oil in the well." This evidence comes direct home to Henry; and upon those representations, thus deliberately made by Henry, Davis

entered into the contract for the purchase of the land, and at great expense and labor explored it. He was diligent in the exploration. He sank four wells: the first, one-third of a mile from the Henry well, 242 feet deep; the other three within the distance of 14 inches of the centre of the Henry well, one to the depth of 130 feet, the second 129 feet, and the third 227, but found no indication of asphaltum or oil. He then reamed out the Henry well, increased the diameter thereof two inches, thus giving it six inches diameter, and in addition, sank the well 230 feet deeper than Henry had it, making a depth of 594 feet, and still found no indications of asphaltum coal or oil, thus demonstrating the falsity of the representations made to Davis. The first contract was unconscionable and fraudulent on the part of Henry, and could not have been enforced in equity.

But it is claimed that Davis has abandoned his right to abrogate the contract, by again bringing himself into contact with Henry, by the modified contract of July 19th, 1865. In the case of *Morse* v. *Royal*, 12 Vesey, jr., 371, Lord Erskine meets this position directly. He says: "As to the doctrine of confirmation, it stands upon several authorities: where a man having been defrauded, with complete knowledge, chooses to come again in contact with the person who defrauded him, abandons his right to abrogate the contract, and enters into a plain, distinct transaction of confirmation. But when the original fraud is clearly established by circumstances, not liable to doubt, a confirmation of such a transaction is so inconsistent with justice, so unnatural, so likely to be connected with fraud, that it ought to be watched with the utmost strictness and to stand only upon the clearest evidence; as an act done with all the deliberation that ought to attend a transaction, the effect of which is to ratify that which, in justice, ought never to have taken place." The same doctrine is affirmed in Sugden on Vendors, pp. 287, 288.

It seems to me Lord Erskine has stated the true princi-

ple, and that this case fairly hinges upon that doctrine. If Davis entered into the contract of July 19th, 1865, with complete knowledge of the fraud practiced upon him in the first contract, which he was at liberty to rescind, he will be bound by it. Sugden on Vendors, 287, and cases cited; Story's Eq. Jur., § 306. The first contract was not absolutely void, but voidable, and, therefore, capable of confirmation, where the party is fully informed, acts with his eyes open. But on the other hand, if Davis was not fully informed as to the fraud, at the time of the contract of July 19th, 1865, or was "still acting under the pressure or influence of the original transaction, or labored under the delusive opinion that the first contract was binding upon him, and was thus induced to enter into the second contract, he is not bound." Story's Eq. Jur., § 345, and note 2. And it seems to me he would not be bound by it, if he was influenced to enter into the second contract, by the declarations which Henry made before, and at the time of the making of said second contract, that Martin testified to, viz : "that the asphaltum would be found as he had represented, at the time of the original purchase," notwithstanding Davis doubted the truth of the statement; because that would be a continuation of the fraud, in order to obtain from Davis a new contract, by misrepresenting facts which Davis was not fully informed of, but relied on the good faith of Henry.

Taking this view of the case, I do not deem it necessary to discuss more fully the points raised by the several counsel; and although I am inclined to the opinion, that the second contract cannot be considered as an abandonment of the right to abrogate, or as a distinct transaction of confirmation, and that upon the evidence, the court below would have perhaps acted properly, had it decreed a rescission of the contract; yet, as the depositions are not entirely satisfactory, but vague and indefinite as to the fact, whether Davis was fully informed at the time of making the second contract, that he had been defrauded by Henry, and that

he intended the second contract to be a distinct transaction of confirmation, I think it would be proper to remand the cause to the circuit court, that the question may be settled by more definite testimony; or as this is clearly a case in which it would be eminently proper, by an issue out of chancery.

Therefore, as the evidence is not sufficient to sustain the decree of the court below, I am of opinion that the same should be reversed, with costs, and remanded to the court below for further proceedings to be had therein.

The other Judges concurred.

DECREE REVERSED.