# CHARLES TOWN.

ENGEMAN *v.* TAYLOR *et al.*

Submitted September 9, 1898—Decided Sept. 9, 1899.

46  669
f62  251

46  669
f64  435

1. FRAUD—*Rescission of Contract.*

   A contract may be rescinded for fraudulent misrepresentations, though the means of obtaining information were fully open to the party deceived, when from the circumstances he was induced to rely upon the other party's representations. (p. 711).

2. FRAUD—*Voidable Contract.*

   Any contract, the making of which is induced by fraud of either party practiced upon the other at the time the contract is made, or while negotiations in regard to it are being carried on, is voidable, and may be rescinded at the election of the party defrauded. (p. 711).

3. FRAUDULENT REPRESENTATIONS—*Contracts.*

   False representations or fraudutent concealment in respect to the subject matter of the contract will entitle the injured party to rescission of the contract. (p. 712).

4. DAMAGES—*Fraud.*

   The court will not inquire into the extent of the prejudice. It is sufficient if the party misled has been slightly prejudiced, if the amount is at all appreciable. (p. 712).

Appeal from Circuit Court Grant County.

Bill by William A. Engeman against James S. Taylor and John E. Taylor. Decree for defendants, and plaintiff appeals.

*Reversed.*

FLICK, WESTENHAVER & BAKER, BENJ. DAILEY, and H. B. GILKERSON, for appellant.

F. M. REYNOLDS, L. J. FORMAN, and J. N. MCMULLAN, for appellees.

MCWHORTER, JUDGE:

On the 26th day of November, 1890, W. A. Engeman, of Brooklyn, N. Y., and John E. Taylor and James S. Taylor, of Hampshire County, W. Va., entered into a writ-

ten agreement of that date forming a partnership to continue for the period of ten years from the date of agreement, for the purpose of erecting and building a tannery near the town of Petersburg, in Grant county, and for the purpose of carrying on and operating said tannery, and buying bark lands and bark rights; the capital stock to be sixty thousand dollars; said Engeman to contribute one-half, and each of the Taylors one-fourth, of said capital; said capital stock to be increased from time to time as the parties might agree upon, the interests to be held by them, respectively, in the proportion stated. There was to be a settlement of the affairs of the co-partnership on the 1st day of July, 1891, and on the 1st day of January and the 1st day of July in each year thereafter, at which said settlements the profits of said co-partnership, if any, should be ascertained. It was agreed that nothing whatever should be drawn out of the business of said concern by any of the co-partners until the settlement of July 1, 1892, at which time the profits should be ascertained and divided in the proportion in which they held their stock, and the co-partners should then determine whether such profits should be paid to them in the proper proportions, or whether they should be invested in the business, and that at each subsequent settlement the profits should be ascertained and paid to the parties, or invested in the business of the co-partnership, as they might agree; that said Engeman and J. S. Taylor should not be required to devote their time and attention to the management of the tannery; that John E. Taylor should be superintendent and manager, and should receive for his services as such one thousand dollars per year, to be paid by said co-partnership, in consideration whereof he was to devote all his time and attention to the superintendence and management of the tannery; that any arrangement made by the co-partnership for the sale of leather manufactured at said tannery in the Eastern markets should be with the consent of all the several co-partners; that there should be kept at all times perfect, just, and true books of accounts, for which purpose a competent book-keep should be employed; that each of said co-partners should duly enter and set down in said books of account all money received by him and all money expended by him

in any manner pertaining to the business of said co-partnership, and that all sales and purchases of whatever kind should be entered and set down in said books of accounts. Afterwards, on the 27th of June, 1892, it was agreed to increase the stock by twenty thousand dollars; Engeman to contribute one-half, and each of the Taylors one-fourth thereof.

On the 21st day of July, 1894, W. A. Engeman filed his bill in chancery in the circuit court of Grant County against the said John E. Taylor and James S. Taylor setting up and exhibiting the said contract and the further agreement to increase the stock, alleging that plaintiff had paid into said firm the sum of thirty-nine thousand, one hundred and fifty-three dollars and fourteen cents on his share of the capital; that plaintiff had been unable to ascertain definitely what amount had been paid in by the defendants, or either of them; that they claimed to have paid in together about thirty-four thousand dollars, but, from facts and circumstances which had recently come to plaintiff's knowledge, he believed and charged that they had paid in a much smaller amount than they claimed, and called upon defendants to prove and show clearly what amount of money they had each contributed to the capital of the firm. Plaintiff alleged that at the time he entered into the partnership he was totally unfamiliar with the tanning business; that during his continuance he resided in the state of New York, and was only at said tannery for short periods several times during the course of each year; that the entire management and control of the erection and construction of all the buildings, machinery, and plant of said tannery were intrusted by him to said defendants, John E. and James S. Taylor, and that said defendants did erect and construct tannery buildings, and other buildings to be used in connection with said tannery, and procured the necessary machinery and appliances for operating said tannery, which said plant was located on land purchased by said firm; that all the buildings belonging to said firm were constructed under the direction and control of said defendants, who were thoroughly familiar with the costs and value of all said buildings; that after said buildings were erected the firm commenced to operate said tannery;

that the control and management of said tannery and business was wholly in the hands of said defendants, the said John E. Taylor being the superintendent and James S. Taylor being the bookkeeper, or an assistant to said superintendent, at a salary of eight hundred dollars a year, and they continued to manage and control the said business during the entire time of said partnership; that, in carrying on and operating said tannery, they purchased bark, which was stacked on the premises, and they also purchased hides, which in the process of tanning was placed in the vats, and that said defendants were thoroughly familiar with the value of the bark and hides on hand at all times; that defendants, instead of owning separate interests in said firm as they claimed and pretended to plaintiff, were in fact acting together jointly in all their relations to said partnership; that whatever money they took in was put in on the joint account, and that there never was any division or separation of their interests in said firm as between themselves, although they led plaintiff to believe their interests were separate and distinct; that during the greater part of the continuance of said partnership the said John E. and James S. Taylor, who were brothers, were interested as partners with one William G. Harwood, their brother-in-law, in a mercantile establishment near said town; that they were so interested in said mercantile establishment up to and after the dissolution of the partnership between them and plaintiff, and that in conducting said tannery business they frequently paid the hands employed at the tannery, and also persons from whom they purchased bark, by giving them orders on said store in which they were so interested; that prior to the 29th of January, 1894, plaintiff became dissatisfied with the manner in which the business of the firm was being managed by the defendants, they having permitted the paper of said firm to go to protest, and plaintiff came from New York and proposed to withdraw from the firm; that after he came on the said J. S. Taylor left the State of West Virginia, and remained absent until plaintiff returned to New York, so that plaintiff was unable to carry out his purpose of retiring from the firm; that John E. Taylor represented to plaintiff that the mismanagement of the business was to be attributed to said

James S. Taylor, and urged the plaintiff to remain in the
firm, stating that he would endeavor to induce James S.
to retire from the firm, and plaintiff agreed that, if James
retired, he would form a partnership with John E. Taylor
to conduct the business; that some time after he return-
ed to New York he was informed by John that James was
willing to retire from the firm by selling his interest to
plaintiff and John E. Taylor; that in pursuance of that
understanding in the latter part of January, 1894, plain-
tiff went to Petersburg, and it was mutually agreed be-
tween the said partners that the interest of said James S.
Taylor in the firm should be ascertained by taking an in-
ventory and valuation of assets and ascertaining the lia-
bilities of the firm, and that the value of his interest in
said firm should be paid to him by plaintiff and said John
E. Taylor, who were to constitute the new firm; that an
inventory and valuation of the assets of the firm was made,
and the liabilities of the firm ascertained (and he filed with
his bill such inventory and valuation of the assets); that,
at the time of making such inventory and valuation, plain-
tiff was totally unfamiliar with and ignorant of the value
of buildings which had been erected and then belonged to
the firm, and also of the quantity and value of the bark
and liquors on hand, and of the hides and leather in the
vats, and of the leather in the hands of commission mer-
chants in the East belonging to said firm, and was obliged
to rely and did rely upon the statements and representa-
tions of the defendant John E. Taylor as to said matter;
that the value of said buildings and the quantity and value
of the said bark and liquors and of said hides and leather
as stated in said inventory were fixed and based upon the
statements and representations of said defendants, and
that the value of the buildings and the quantity and val-
ue of said bark and liquors and hides and leather were by
reason of said statements and representations of said de-
fendants grossly overestimated, and that said overvalua-
tion and the statements and representations of said defend-
ants in relation thereto so made to plaintiff were made
by them knowingly, falsely, and fraudulently, with the
intent to so increase the assets of the firm as to make the
interest of said James S. Taylor therein appear very much
larger than it really was, and thereby defraud plaintiff,

and charged that in making such valuation defendants col-
luded together and against plaintiff, and both were inter-
ested in whatever amount was to be paid to James for his
interest; that by said inventory and valuation the hides
belonging to the firm and the interest of the firm in certain
leather that was being tanned for other parties were put at
sixty thousand, thirty-six dollars and twelve cents, the
valuation of tannery and other buildings was put at nine-
teen thousand, nine hundred and sixty dollars, liquors in
the vats at two thousand, six hundred dollars, and the
bark at sixteen thousand dollars, the inventory and valu-
ation amounting to one hundred and twenty-two thous-
and, seven hundred and thirty-one dollars and forty-six
cents, and the bills receivable and the accounts due the
firm and cash on hand made the total assets of the firm
one hundred and twenty-five thousand, seventy-seven dol-
lars and fifty-two cents, and the liabilities of the firm were
represented to be forty-nine thousand eight hundred and
forty-five dollars and five cents; that upon that showing
it was made to appear that the firm had made a profit of
three thousand, one hundred and five dollars and sixteen
cents, which said profit was divided and placed to
the credit of each of said parties as follows:
To plaintiff one-half, and to each of defendants
one-fourth; that upon the basis of said valuation
and statement of liabilities the interest of the several
parties was ascertained to be as follows: The interest of
plaintiff forty thousand, seven hundred and five dollars and
seventy-two cents, of John E. Taylor seventeen thousand,
one hundred and fifty-nine 'dollars and fourteen cents, and
of James S, Taylor seventeen thousand, three hundred and
seventeen dollars and sixteen cents; and that on the 29th
of January, 1894, the firm of Engeman & Taylors was dis-
solved by mutual consent of the parties, and a new firm,
composed of plaintiff and John E. Taylor, was formed for
the purpose of carrying on and operating said tannery, and
for other purposes, under the style of Engeman & Taylor;
that said new firm purchased the interest of said James
S. Taylor in the late firm for the sum of seventeen thous-
and, three hundred and seventeen dollars and sixty-one
cents; and he filed a copy of agreement of sale of said in-
terest. Alleges: That, at the time of said purchase of

James S. Taylor's interest, plaintiff paid him six thousand, fifty-seven dollars of said purchase money by assigning to him, with recourse, six notes, of one thousand dollars each, executed by A. W. Harper to plaintiff, dated December 30, 1892, with interest thereon from December 1, 1892, payable annually, the accrued interest thereon at the time being fifty-seven dollars, and for the residue of said purchase money the firm of Engeman & Taylor gave to said James S. Taylor three notes as follows: One for three hundred and seventeen dollars and sixty-one cents, payable on demand, one for five thousand, four hundred and seventy-one dollars and fifty cents, payable in six months, and one for five thousand, four hundred and seventy-one dollars and fifty cents, payable twelve months after date, with interest on all of said notes from date, and all dated January 29, 1894. That afterwards the twelve months note was taken up, and a new note for the same amount, bearing same date, was given by said firm to James S. Taylor in lieu of it; said new note being payable two years after date, with interest. Said new note was given before plaintiff made the investigation and discoveries thereinafter mentioned. That then, recently, in view of purchasing the interest of John E. Taylor in said firm of Engeman & Taylor, plaintiff made a careful investigation and examination as to the assets and value thereof received by the new firm from the old firm, and found that, in the inventory and valuation that was made at the time of the purchase of the interest of James S. Taylor, there was a gross overvaluation of the assets of the old firm of Engeman & Taylors received by said new firm. That in four items alone the overvaluation amounted to the sum of thirty-four thousand, eight hundred dollars, as follows, to wit: That the tannery buildings and other buildings valued at nineteen thousand, nine hundred and sixty dollars in said inventory were really worth, at the most, not over ten thousand, one hundred and sixty dollars, making an overvaluation of nine thousand, eight hundred dollars on said item; that the hides and leather valued in said inventory at sixty thousand, thirty-six dollars and twelve cents were really worth, at the most, not over forty-one thousand, thirty-six dollars and twelve cents, making an overvaluation of nineteen thousand dollars in said item; that the bark valued in said inventory at sixteen thousand dollars was

really worth, at most, not over twelve thousand dollars, making an overvaluation of four thousand dollars in said item; and that the liquor in the vats valued in said inventory at two thousand, six hundred dollars was not really worth, at the most, over six hundred dollars, making an overvaluation of said item of two thousand dollars. That said overvaluations were made upon the statements and representations of said defendants, which said statements and representations were false and fraudulent, and made with the intent to defraud the plaintiff. That plaintiff, having taken no part in the construction and erection of said buildings, or in the purchase of said hides and bark, and being ignorant and uninformed as to the value of said property, relied upon the said statements and representations of the defendants as to the value of said property, and acquiesced in said valuations, and was grossly deceived and defrauded thereby. Alleges that the books of account kept by defendant James S. Taylor are not true and correct, but are in mixed and confused condition; that many errors have been discovered in said books by plaintiff, and believes and charges that there were others which might be ascertained by a more thorough investigation; that among the liabilities claimed to exist against the firm of Engeman & Taylors was a claim of two thousand, seven hundred and eighty-four dollars and twenty-two cents to the firm of Harwood & Taylors, in which the defendants were interested, as before stated; that plaintiff had reason to believe and did believe said claim was incorrect, and plaintiff was informed and believed that in said account were included items amounting to several hundred dollars gotten by J. E. Taylor for his individual use, which were not charged to him upon the books of Engeman & Taylors; that John E. Taylor, as manager of the tannery, instead of using the firm's money that came to his hands to pay the employes, and to pay for bark and other articles purchased for the tannery, was in the habit of depositing the money, or a large part of it, with the said firm of Harwood & Taylors, and requiring such employes and persons to take orders upon the said store of Harwood & Taylors. Alleges that by said settlement of the partnership affairs made January 29, one thousand, eight hundred and ninety-nine, it appeared that the firm had made a profit of three thousand, one hundred and five dol-

lars and sixteen cents, when in fact plaintiff had discovered by examination and investigation that instead of a profit there was a loss amounting to at least thirty-six thousand dollars, and it might be more; that plaintiff had specified instances of errors and irregularities in the books of account of the firm, and in the method of transacting the business of said firm by the defendants, and charged there were a great many other errors and irregularities, and improper entries and omissions in said books, which would seriously and materially affect the interests of the several partners in the firm; that by reason of the overvaluations upon the four items of buildings, hides, and leather and bark, and the liquors in vats, the value of the interest of James S. Taylor was made to appear to be greatly in excess of what it really was, and that, instead of being worth seventeen thousand, three hundred and seventeen dollars and sixty-one cents, it was in fact not worth more than eight thousand dollars, after deducting said overestimations, and without taking into consideration any of the other many errors and irregularities shown to exist in the said books of account of said firm, and in the business methods of the defendants, who managed and controlled the business of the firm; that plaintiff believes that, on a full and fair settlement of the interest of said James S. Taylor in the firm, it would be found to be very much less than eight thousand dollars, and that it was impossible to tell the real value of said interest without a full and complete investigation and settlement of the affairs of said late firm under direction of the court. Alleges that he was advised that by reason of the facts stated concerning the settlement of January 29, 1894, by reason of the method and manner in which the business of the firm was conducted by the defendants, and by reason of the many errors in the books of accounts of the firm, and the confused and unsatisfactory condition of the same, and that by reason of the uncertainty of the assets and liabilities of the firm, he was entitled to have said partnership settlement set aside, and the notes given by the new firm for his interest canceled and delivered up and also to have returned to him the six one thousand dollar notes of A. W. Harper assigned by him to said James S. Taylor, and to have a complete and full settlement of the partnership affairs of said late firm, the assets and liabilities ascer-

tained and determined, the creditors of said firm convened, and the interests of the several partners in the firm ascertained; and the prayer of the bill was in accordance therewith, and that James S. Taylor should be enjoined and restrained from transferring, hypothecating, or otherwise disposing of, or bringing suits on, the notes, or either of them, assigned to him by plaintiff, or executed to him by the new firm of Engeman & Taylor for his alleged interest in said partnership, and for general relief. The bill was sworn to. Injunction was granted as prayed in the bill July 23, 1894.

Defendant James S. Taylor filed his answer, admitting he was employed as bookkeeper and assistant to John E. Taylor at a salary of eight hundred dollars per year, and averring: That at all times his actions were under the control and supervision of said John E. Taylor. That at all times all his transactions in bookkeeping and making purchases and sales for said firm were open to the inspection of all members of the firm, and were well known to all the members. That plaintiff at all times had the opportunity to investigate all the entries made by respondent as bookkeeper, and did from time to time until the 29th day of January, 1894, examine into and had full knowledge of all the entries on the books, and all purchases and all sales made by the respondent for the firm. That the business was started, as alleged, with sixty thousand dollars capital, and afterwards increased to eigthy thousand dollars, to be contributed and held as alleged,—one-half by plaintiff, and one-fourth by each of the defendants,—but there was no agreement as to any particular time when the capital should be paid in, and it was in fact contributed at different times and in different amounts by each of the members, and the books show the amounts paid in, but respondent could not then tell just how the capital was contributed, as the books of the firm were in the possession of the plaintiff, and he would not allow respondent to have access to them. That, according to his recollection of such entries, the amount contributed by respondent and John E. Taylor was thirty-four thousand dollars; that said amount was contributed by them equally. Denied that they were jointly interested in said firm, but, on the contrary, they owned their interest separate and distinct from each other. That plaintiff lived in New York, as alleged, but respondent says that he was frequently present when the buildings, tannery, plant, and

all the business of said tannery were being constructed. While it is true that the building was constructed and the plant gotten ready for operation under the supervision of said John E. Taylor, yet plaintiff was well informed as to the expenditures of said buildings, plant, and machinery. That everything was entered in the books, but not separately. No separate accounts of any of the buildings were kept, and they were not put up at or near the same time, but from time to time during the continuance of the partnership, for which reason none of the partners at the time of the sale of January 29, 1892, knew the cost of the buildings, and in making the inventory all the parties had access to the same source of information to arrive at the value, and used the same information. That the values of the buildings in the inventory were mostly made by plaintiff and defendant John E. Taylor, and respondent believed the valuation, nineteen thousand, nine hundred and sixty dollars to be just and fair at the time of the sale. That all the parties had the same information as to the price given for bark and the amount on hand at the time of said inventory and respondent believed said inventory a just and correct valuation, and that said bark was worth sixteen thousand dollars at the time of the sale, and in estimating the value of the hides and leather put in said inventory all the parties had the same information before them upon which to base their estimate. The number of hides on hand, and the price given for same, were well known to all the parties, and all parties had full knowledge of the price for which all leather had been sold. That, in estimating the hides and leather, plaintiff was in possession of all the facts as to the condition of the hides in the vats and the condition of leather that had been shipped which was in possession of respondent, and denied any concealment or any false or fraudulent representations, and believed the value was just and fair, and, if the hides and leather sold for only forty-one thousand, thirty-six dollars and twelve cents, it was not because it was valued too high in said inventory, but because it was forced on the market and sold at a loss, or because of the depreciation of value in leather after the sale of January 29, 1894. That in estimating the value of liquors all parties had the same information and facts to act upon. There were no concealments or false or fraudulent

representations made by respondent as to the value of said liquors, and said valuation was a just and fair one. That said inventory was made only for the purpose of aiding parties to arrive at a valuation of all the assets and liabilities of the firm, and in taking said inventory plaintiff and John E. Taylor acted together for themselves in putting a valuation upon the various items, and respondent was acting for himself, and denied that there was any collusion or fraud between respondent and John E. Taylor in making said inventory and contract of sale of Janury 29, 1894. That in fact he was not compelled to sell his interest according to the value fixed on same, but had a perfect right, after the completion of the inventory, to refuse to sell at any price, and in fact did sell his interest for the sum of seventeen thousand, five hundred dollars outright, without any agreement on his part that he would be compelled to sell at the price in the inventory, and that he was in no way bound by the valuation fixed in said inventory, even should it be ascertained that such valuation was in excess of the just and correct values. That, after the inventory was made, plaintiff proposed to respondent to give him the amount so ascertained, and respondent refused to sell at said price, and insisted on twenty thousand dollars for his interest, and never agreed to accept seventeen thousand, five hundred dollars until after plaintiff positively refused to give respondent any more, and threatened him that unless he would sell at that price he would bring suit and dissolve the firm, and have the business put in the hands of a receiver, and, seeing that plaintiff was determined to have respondent out of the firm, and knowing that a suit would involve much trouble and vexation and considerable cost, finally agreed to sell at said price of seventeen thousand, five hundred dollars, which said sum was a compromise and a sale in gross, and somewhat in excess of the amount which the inventory showed. Denied that he sold for the sum of seventeen thousand, three hundred and seventeen dollars and sixty-one cents, as alleged in the bill, and says that the sale was completed only after plaintiff had made a thorough personal examination of all the property, and of all the facts in the case, and the books of the firm, with the assistance of an expert bookkeeper and accountant brought by plaintiff from New York. That said sale of January 29, 1894, was

made between the parties at said sum of seventeen thousand, five hundred dollars, without any warrant or guaranty of any description whatever on part of respondent as to quantity, quality, or value of any item or items in said inventory. Denied that he left the state of West Virginia because he knew that the plaintiff wanted to retire from the firm, and left to avoid him. Averred that he went at that time to Philadelphia, and from there to Ohio, on business for the firm, and not to avoid plaintiff. That he was first informed by his brother, John E. Taylor, that plaintiff wanted him out of the firm. That as soon as he learned this he was willing to sell his interest, provided he could get its value, and so informed his brother, as he did not wish to remain a member of the firm if the other members were dissatisfied with him. Avers that the seventeen thousand, five hundred dollars paid him was reduced by an account he owed the firm of one hundred and eighty-two dollars and thirty-nine cents, which left the sum of seventeen thousand, three hundred and seventeen dollars and sixty-one cents. Admitted that the note due at twelve months from the new firm to him was on the 19th of April, 1894, taken up, and another note given for the same amount, bearing the same date, at two years from date, with interest, but denied that said new note was given before plaintiff had made the investigation and discoveries he alleged were made by him, and averred that, at the time said new note was given, plaintiff well knew that all the liquors in the vats mentioned in the bill had been used up, and well knew the quantity and quality and value of said liquors, that a large portion of the bark sold by respondent had been used up, that a large portion of the hides and leather had been tanned and shipped at the time said new note was given, and plaintiff had full knowledge of the quantity, quality, and value of the hides and leather. That from the time of the sale of January 29, 1894, until the time said new note was given, plaintiff had his own trusted agents in control and management of the tanning business, and the agents of plaintiff had full opportunity to examine into the value, quantity, and quality of all the hides and leather, except what leather had been sold at the time said new note had been given, and believed said agents had fully informed plaintiff of all the facts in the case. That at the

time said new note was given all the books of said business had been inspected and fully examined by two expert bookkeepers and accountants employed by the plaintiff for the purpose, and plaintiff had all said books in his possession and control, and every transaction entering into said sale of January 29, 1894, had been fully examined and investigated at the time said sale was made, and at the time said new note was given, and plaintiff had possession of all the facts, as much as was in his possession at the time of the institution of this suit. That on the 19th of April, 1894, plaintiff, after being fully informed of all the facts, ratified and confirmed said sale of January 29, 1894, by writing and signing a paper, a copy of which he filed with his answer, and which is as follows: "Petersburg, April 19, 1894. If I give J. E. Taylor a deed of trust, as per agreement, J. S. Taylor is to have one to secure his note for five thousand, four hundred and seventy-one dollars and fifty cents, with the same land as security. William A. Engeman. J. E. Taylor." Respondent averred that just before the institution of this suit, after plaintiff had fully investigated all the facts in his possession upon which it is claimed his suit was based, he ratified and confirmed said sale of January 29th by going to respondent and requesting him to release him and J. E. Taylor from payment of five hundred and twenty-one dollars, a part of the purchase money, because two hundred and thirty-two dollars and eighty-three cents of said sum was the portion of respondent in accounts, bills, and other items which had been presented to the firm for payment after the sale, and which had not been entered in the books and taken into consideration when the sale was made, two hundred dollars of the amount being a part of the salary which had been credited to respondent, and which plaintiff wanted him to release, claiming that the sale was a good one for respondent, and eighty-eight dollars and twenty-three cents, the balance of said five hundred and twenty-one dollars, being shortage on leather, as plaintiff claimed, and plaintiff claimed no other reduction on said purchase money than the five hundred and twenty-one dollars. Respondent admitted the partnership of defendants with Harwood, as Harwood & Taylors; that they did considerable business with them in the way of orders to hands on said firm. Denied that moneys of

the firm were deposited with Harwoood & Taylors, but, on the contrary, Harwood & Taylors made advances to the tanning firm, and all deposits made with that firm were payments on accounts justly due the firm of Harwood & Taylors from Engeman & Taylors, all of which the books then in possession of plaintiff would show. Averred that be believed all said accounts were correct, and, if not correct, and he knew nothing about their incorrectness, and plaintiff was fully informed as to the nature and condition of said accounts, and how they were made, at date of said sale of January 29, 1894. That respondent kept the books of the firm, and believed they contain a complete record of the transactions of said firm, and that they are correct. That no entry or omission therein was made by him fraudulently, and, if there were any errors or omissions in said books, they were made without any fraudulent intent on his part. That he had little experience in bookkeeping in partnership affairs, and while keeping the books he was frequently engaged in other business for said firm, and sometimes absent from the tannery several days at a time on business of the firm, and, not having time to make a full entry of each transaction, would sometimes make entries of orders given by the firm for small amounts in bulk, on settlements with parties who had paid said orders, but at all times only charged the firm with such amounts as he believed justly due from them, and no account was charged or entry made that he did not believe just and correct. That at time of the sale plaintiff had access to the books kept by respondent, and had them fully examined by two expert bookkeepers and accountants brought by plaintiff from New York for the purpose, and, as soon as sale was completed, respondent gave up to plaintiff and John E. Taylor full possession and control of said books, all papers, accounts, vouchers, and other evidences of transactions of said firm, and in whose possession they remained until, as respondent was informed, plaintiff, on the night of July 24, 1894, had them carried out of Grant county, and he believed they were in New York, and therefore could not answer more definitely as to items entered in said books, papers, etc., and that unless plaintiff would allow respondent access to said books, etc., the court should dissolve the injunction and dismiss plaintiff's bill, and again denied any concealment,

fraud, or fraudulent representation on his part, and any collusion between himself and John E. Taylor, and that John E. Taylor had any interest whatever in the amount he was to receive for his interest under the sale, and insisted that the injunction should be dissolved, and plaintiff's suit dismissed, and the sale be not set aside. That if plaintiff, having full opportunity to investigate and examine into the affairs of the firm, failed to do so, he was guilty of laches; and it being impossible for the court to restore the parties to the position they occupied at time of the sale, if said sale should be set aside, because of the fact that a great portion of the hides and leather had been sold, the liquor and a large part of the bark had been used, and many changes had been made in the business since said sale, and all of said changes had been made without the advice and consent of respondent, it would be impossible for the court to restore the parties to their just rights, and would work great injustice to respondent should said sale be set aside.

John E. Taylor answered, denying any fraud or collusion between himself and James S. Taylor, or that he had any interest in the amount which James S. Taylor was to receive for his one-fourth interest in the business, averring that the inventory filed with plaintiff's bill was made up by and with the assistance and agreement of all the parties, but chiefly by respondent and plaintiff, for the purpose of arriving at a just and correct valuation of the assets and liabilities of the firm, and, in making same, respondent and plaintiff were acting together, and with a view of purchasing James S. Taylor's interest and continuing the business under the new firm, and James S. Taylor was acting for himself, and, when completed, respondent and plaintiff thought the inventory just and fair, and were willing to pay the amount as shown by same to James S. Taylor, but he refused to accept it, and demanded twenty thousand dollars for his interest, and finally agreed to take seventeen thousand, five hundred dollars, which was paid him, as alleged in the bill, after deducting one hundred and eighty-two dollars and thirty-nine cents; that the firm was dissolved at the instance and solicitation of plaintiff, who had become dissatisfied with James S. Taylor as a member of the firm, and wanted him out, and requested respondent to see

him about selling his interest in the firm; that, if any con-
cealment or false or fraudulent representations were made,
he knew nothing about it, and denied any such on his part;
that he believed the account of two thousand, seven hun-
dred and eighty-four dollars and twenty-four cents of Har-
wood & Taylors against the firm was just and correct, and
embraced only proper charges against the firm, and knew
nothing about any items in said account being for the ben-
efit of respondent which had not been accounted for by him,
and denied there were such items.  Admitted his personal
liability for two hundred dollars of the one thousand, two
hundred dollar note of the firm of D. Bane & Bros., he hav-
ing turned the one thousand dollars borrowed from D.
Bane and Bros. into the firm, and in giving the
note therefor had included two hundred dollars
which he owed personally, and had forgotten for
the time to mention the fact of making the note for
one thousand, two hundred dollars, which included his per-
sonal liability of two hundred dollars; that after the pur-
chase of James S. Taylor's interest, the new firm took pos-
session and control of the tannery, and used up the liquor
and a portion of the bark, and proceeded to tan the hides
and sell the leather which was embraced in the inventory,
from the date of sale until July 2, 1894, and on the 18th of
April, 1894, respondent and plaintiff entered into an agree-
ment in writing, which is filed with the answer, whereby
plaintiff on the 2nd day of July, 1894, was to purchase the
interest of the respondent in the new firm of Engeman &
Taylor, and the value of said interest was to be determined
by an inventory agreed upon by the respondent and plain-
tiff, if possible, and in case they could not agree the value
was to be determined by arbitrators mentioned in said
agreement, viz. James S. Taylor and N. S. Henkle, and a
third man to be selected as provided in said agreement, and
on said 2nd day of July plaintiff and respondent proceeded
to carry out said agreement, and negotiated the sale there-
in mentioned, and tried to complete the same, but without
effect until the 13th day of July, 1894, at which time re-
spondent and plaintiff definitely settled upon what he was
to receive for his interest in the new firm, and when said
settlement had been made, at the instance of plaintiff, re-

spondent signed a revocation of said agreement as to arbitrators, and gave to plaintiff full possession of the business, and plaintiff had had possession of said business ever since, and was carrying it on in his own name, and refused to complete the purchase of respondent's interest as he agreed to do, and that from the time of said sale of January 29, 1894, until the institution of this suit he had no knowledge that plaintiff intended to attempt to set aside the sale of January 29, 1894, of James S. Taylor's interest; that the court should not set aside the said sale, because it would be unjust to respondent in his sale of his interest to plaintiff; that after plaintiff had induced respondent to sign said revocation of arbitration, and had agreed to purchase respondent's interest, and thereby induced him to give plaintiff full control of said tannery business, plaintiff failed and refused to execute his notes for respondent's interest, and to secure the notes by mortgage, as he had promised, and had not only instituted this suit, but had instituted another suit in chancery in the same court against respondent for the pretended purpose of settling, adjusting, and winding up of the partnership affairs of the new firm of Engeman & Taylor, and for the pretended purpose of asking the court to fix a value on respondent's interest therein, or to have a sale of all the partnership assets of said firm; but respondent says the real purpose of both of said suits is a plan or scheme of plaintiff to harass, perplex, and defraud respondent and James S. Taylor, and to delay the payments of the amount due by him, and to hold possession and control of said tannery business, against the interest and advantage of respondent. And he denied emphatically all the allegations of plaintiff's bill as to any fraud, concealment, false or fraudulent representation, or collusion or combination with James S. Taylor, in effecting the sale of January 29, 1894, and denied that he fraudulently put any overvaluation on any of the items in the inventory filed with plaintiff's bill in order to in any way assist said James S. Taylor in getting more than his interest was worth, and he had no interest in the amount to be paid James S. Taylor, but, on the contrary, respondent was deeply interested in getting a low valuation on the items in said inventory. Which answers were sworn to August 8, 1894, and plaintiff replied generally to same on March 29, 1895.

On motion of J. S. Taylor, plaintiff was directed, upon five days' notice to him or his attorneys from counsel of J. S. Taylor, to place all the papers, accounts, and books of Engeman & Taylors involving any matter in this suit in the custody of the clerk, to remain in his custody for one week in each month, if said J. S. Taylor desires the same to remain such length of time in such custody, for the purpose of allowing said J. S. Taylor to make his defense in this case, and said Taylor and his counsel to have free access to said books, accounts, and papers for the purpose of examination. Afterwards, on the 22nd day of October, 1895, on motion of J. S. Taylor, it was ordered that all the books, freight receipts, bills, and accounts should within ten days from that date be placed in the clerk's office, in the custody of the clerk of said court, and either party should have access to the same while in the custody of the clerk, unless parties, by their counsel, should otherwise agree as to the custody of said books.

Depositions were taken by the parties and filed in the cause, covering nine hundred and forty-eight pages of the printed record, and on the 25th day of October, 1897, the cause came on to be heard "on the plaintiff's bill of complaint, and Exhibits A, B, and C, therewith filed; the answer of J. S. Taylor, and Exhibit Y, thereto attached, hereto filed, and general replication thereto; the answer of J. E. Taylor, and Exhibit XX, hereto attached, heretofore filed, and general replications thereto; the depositions of W. A. Engeman, and Exhibits LLL, MMM, PPP, OOO, SSS, Z, U, V, W, X, Y, AB, K, NNN, LA, Nos. 1 to 12, inclusive, and Exhibit marked 'W. A. Engeman's Deposition, January 3, 1894,' taken on behalf of the plaintiff, and filed in this cause; the depositions of E. Haupt, Clarence Cookus, M. S. Henkle, Thomas Cover, and E. T. Keller, with Exhibits A, B, C, D, E, F, G, and I; and the depositions of William J. Newhouse, J. William Kuykendall, with Exhibit A, and the depositions of James Barger, J. W. Gum, Sol Shobe, Jacob B. Davis, Charles Barger, and T. M. Jackson, with Exhibits A, B, and C, and also Exhibits Nos. 1, 2, 3, and 4, with rebuttal testimony; and the depositions of F. A. Godlove, Henry B. Drayton, J. T. Hopple, James Kellar, J. E. Funkhouser, and Charles Deputy,—all of which depositions were taken at sundry times, and filed and read in this

cause, at the hearing thereof, on behalf of the plaintiff. Al-
so, upon the depositions of J. S. Taylor, with Exhibits 1 to
15, inclusive, and Exhibits 1 and 2, with rebuttal deposi-
tions, and depositions of J. E. Taylor, with Exhibits L, A,
B, C, D, E, F, and 1 to 20, and depositions of M. H. Shobe,
William Nailer, James W. Hamilton, Sam A. Hill, Isaac
Lee Patch, Ed Lewis, Samuel W. Barrett, Jacob Hinkle,
Russell Gaiter, Kenny Swick, Alex Singleton, Harry Gray,
William Dice, Jacob Hinkle, J. W. Parker, J. W. Gilkeson,
William Sentener, John G. Hoffman, J. H. Berry, W. C.
Burkhiser, James B. Reese, William Gurd, Samuel Barrett,
F. A. Godlove, and W. C. Smith, all of which depositions
were taken on behalf of the defendant J. S. Taylor at sun-
dry times, filed in this cause, and read at the hearing there-
of on behalf of the defendant J. S. Taylor; and the cause
was argued by counsel. And the court, upon considera-
tion thereof, is of opinion and doth decide that the sale
of January 29, 1894, should not be canceled, rescinded, or
set aside, but that there were overvaluations in the items
of leather and liquors included in the inventory valuation
of the property of the firm of Engeman & Taylors, on the
basis of which the plaintiff and J. E. Taylor agreed to pur-
chase the interest of J. S. Taylor in the said firm, which
entitles the plaintiff to relief by way of an abatement to
the extent of such overvaluations from the price agreed
to be paid for such interest, but the court does not express
any opinion at this time as to whether there were any over-
valuations in the items of bark and buildings included in
said inventory and sale. It is therefore adjudged, ordered,
and decreed by the court that this cause be, and the same
is hereby, referred to Commissioner in Chancery D. P. Hen-
drickson, with instructions to ascertain and report the
amount that should be allowed as an abatement on the pur-
chase price of J. S. Taylor's interest on account of the ov-
ervaluation of the aforesaid items of leather and liquors,
taking the value of said leather and liquors at the time of
the sale of January, 1894, and also what amount, if any,
should be allowed as an abatement from said purchase
price on account of the aforesaid items of bark and build-
ings, and to make such report as soon as practicable. But,
before proceeding to execute this order of reference, the
said commissioner shall first give to the parties to this

suit, or their attorneys of record, not less than twenty
days' notice of the time and place of executing the same."
And on the 14th day of December, 1897, it was again heard
on the papers and proceedings theretofore read and heard,
and on a motion made by J. S. Taylor to dissolve in part
the injunction awarded in the cause, which motion being
argued, the court decreed a dissolution of the injunction
so far as the same enjoined and prohibited the transfer,
hypothecation, and collection of that part of the consider-
ation agreed to be given by the defendants known as the
"A. W. Harper Notes," having been assigned to the said
J. S. Taylor by W. A. Engeman at the time of the sale to
W. A. Engeman and J. E. Taylor of his interest in the
firm's assets, said notes amounting at the time of such
transfer to the sum of $6,057.30, from which decrees plain-
tiff Engeman appealed to this Court, insisting that "a suf-
ficient reason why both decrees are erroneous may be found
in the rule of law which permits a defrauded vendee to
set aside and rescind the transaction, and have his notes
and other considerations returned to him, provided he has
not in the meantime, with knowledge of the fraud, con-
firmed the contract. As no such confirmation was shown
in this case, and as the court specially found the defend-
ant James S. Taylor guilty in two instances of the gross
fraud charged in the bill, and does not acquit him in any
respect, neither the court nor James S. Taylor had any
right to compel the plaintiff to accept relief by way of
abatement, instead of as allowed by law, through an entire
rescission of the transaction. The injury done to a de-
frauded vendee is too far-reaching, in the eye of the law
and in fact, to be repaired by an allowance of money dam-
ages."

The defendant John S. Taylor contends that there is
no error in said decrees whereby plaintiff is prejudiced and
is entitled to have same reversed, but, on the contrary, in-
sists that he (Taylor) is prejudiced by said decree of the
25th of October, 1897, and that the circuit court, when it
refused to cancel, rescind, and set aside the sale of Janu-
ary 29, 1894, should have dismissed plaintiff's bill, and
assigns the following cross errors: "First. Because the
evidence clearly shows that the plaintiff, W. A. Engeman,
had a full and complete knowledge of the values of the

items embraced in the said inventory as the said James S. Taylor had; and, having such knowledge, he had no right to any abatement upon any of the valuations fixed in the said inventory, even if the evidence could show that the valuations were too high. Second. The bill should have been dismissed because it is clearly established in the evidence that W. A. Engeman, after he had discovered a great amount, if not all, of the overvaluations now claimed by him, re-ratified and confirmed the contract of sale of January 29, 1894, by renewing a part of the contract price on the 19th of April, 1894. Third. Because the plaintiff, after he had discovered what he now claims to be overvaluations in leather, liquor, and hides (the only three items about which there can be any controversy), did nothing to place James S. Taylor in *statu quo*, but used and controlled each and every one of these items as his absolute property, with such full knowledge, until he had disposed of the whole of them, without notice to, or without the advice or consent of, the said James S. Taylor. Fourth. Because the contention of the plaintiff is based entirely upon the assumption of the collusion between John E. Taylor and James S. Taylor. Without such collusion, according to the pleading in this case, the plaintiff is without remedy. Such collusion is not shown by the evidence. Fifth. Because John E. Taylor, in his answer, claims that a new contract has been entered into between himself and W. A. Engeman, by which his rights under the said new contract would be compromised and prejudiced should the said sale be set aside. This new contract was entered into by the plaintiff long after his discovery of the overvaluations in the leather, and therefore he should not be allowed to avoid this new contract, after the discovery of the overvaluations, by asking the court to set aside and render null and void the sale of January 29, 1894. And, lastly, the court should have dismissed the plaintiff's bill, because as before stated, it is based entirely upon the assumption that there was collusion between John E. Taylor and James S. Taylor, and, if the said sale should be set aside, John E. Taylor would be allowed to reap the advantage of his own fraud; and we submit that, if such collusion had been fully proven, W. A. Engeman's only remedy against such collusion and fraud would be against John E. Taylor, be-

cause John E. Taylor, as shown by the evidence, was manager of the business of the Brighton Tannery from its commencement, and had full, perfect, and complete knowledge of all the facts and circumstances within the knowledge of James S. Taylor, and should be held responsible, personally, for such collusion and fraud, if any there was, to his said partner, the plaintiff." The appellant says: "The circuit court, as shown by its decree of October 25, 1897, found the defendants guilty of the gross fraud and conspiracy charged in the bill with respect to the items of hide, leather, and liquors, but expressed no opinion with respect to other items. * * * The failure of the circuit court to follow its finding on the facts to its logical conclusion in law, and wholly annul the settlement and sale, and order a new settlement, is the occasion of this appeal." Testimony, oral and documentary, covering nearly one thousand pages of the record, was taken and filed in the case.

Appellant entered into a business with appellees in which he had no experience or practical knowledge. The contract of co-partnership provided that John E. Taylor should be superintendent and manager of the business of the firm (the tannery business), that he should receive the sum of one thousand dollars per year for his services, and that he should devote his whole time and attention to the superintendence and management of the business, and that the other members of the firm, W. A. Engeman and James S. Taylor, should not be required to devote their time and attention to the business. The contract further provided that there should be kept at all times during the co-partnership perfect, just, and true books of accounts, for which purpose a competent bookkeeper should be employed, and it further provided that there should be a settlement of the affairs of the concern on the 1st day of July, 1891, and on the 1st day of January and the 1st day of July in each year thereafter, at which times the profits of the firm should be ascertained, and divided among the partners according to their interests (i. e. one-half to Engeman and one-fourth to each of the Taylors), or, by agreement, such profits should be invested in the business. The defendant James S. Taylor was soon employed as bookkeeper and assistant manager. No settlements being made as provided in the contract of co-partnership, and the appel-

lant visiting the tannery very seldom, and only for a few hours at a time, and finding the books kept in a very "mixed and confused" condition, he became dissatisfied with the conduct of the business. In March, 1893, he sent a clerk, who he says was not a regular bookkeeper (D. J. McKinley), from New York, to assist the bookkeeper, James S. Taylor, in correcting and putting the books in shape up to the 1st of April, 1893, when he (appellant) advised that a new bookkeeper should be employed. It appears from the evidence that said J. S. Taylor was almost wholly ignorant of the art of bookkeeping, and unfit, therefore, for the duties imposed upon him in that regard; and in consequence the books were very nearly unintelligible, and but little could be satisfactorily gathered from them. Engeman, in his testimony, says that D. J. McKinley came to New York with J. S. Taylor, and at deponent's office gave him a roll of papers which he (McKinley) said would give the facts and details which he had instructed him to secure, 'and also gave him a statement which showed a profit of over sixteen thousand dollars. Witness says: "I was dissatisfied with his work. Subsequently, in January, 1894, J. S. Taylor told me that he had fooled this man, and knew I could not tell anything about the business by the papers he gave me; that he was so full of laugh, when McKinley was explaining to me, that he had to leave the room. These papers were put aside, and I did not examine them thoroughly until recently." And he says: "Until I was there in September, 1893, I was at the tannery (during the partnership) three or four times, about five hours each time. In September, 1893, I went there every day for several days." Says he went there for the purpose of retiring from the firm; that he saw J. E. and J. S. Taylor; that he complained of the way the business had been managed; that J. S. Taylor said he had to go to Philadelphia, but would be back in a few days. After J. S. Taylor left, he had several conversations with J. E. Taylor, who said that all the trouble had been caused by J. S. Taylor, his brother; that he was drunk a greater part of the time, and was running after women, and, instead of staying at the tannery and assisting him in keeping the books, he spent the greater part of his time at the store; that he had refused to go and purchase hides, and that he could not trust him to run

the tannery when he (J. E. Taylor) had to go away; that he could not tell anything, from the way J. S. Taylor kept the books, about the business; that he wanted to get rid of him; that he thought, if he and Engeman should form a partnership, they could run the business satisfactorily, and urged upon him continuously not to insist on retiring, as it would not leave capital enough to run the business. Once witness finally agreed to continue the business with him, if he would get J. S. Taylor out, and arrange so that they could have some time to get out his capital, and says J. S. Taylor did not return, but he heard that he had gone to Ohio, and witness had to leave. J. E. Taylor conferred with J. S. Taylor about selling his interest to J. E. Taylor and Engeman, and he agreed to sell if he could get what it was worth. Appellant sent a practical bookkeeper (T. M. Jackson) to the tannery, who arrived there the 18th of January, 1894, who states: That while he was there he was examining the books of the company with J. S. Taylor, and trying to get a trial balance and balance sheet of the books. That J. S. Taylor was with him in the office most of the time, working on the books. W. A. Engeman and J. E. Taylor were in and out of the office frequently, making a list of the property. The question of the amount which should be put down opposite each item in the inventory was frequently discussed by all the parties until the total was finished, and, as far as he remembers, J. E. Taylor, J. S. Taylor, and W. A. Engeman were always present when any amount was fixed for each and every item. When the total was finally agreed upon, it was entered into the list of assets on the balance sheet, and the result showed a small profit. They all took part in the discussion. Usually in some part of the discussion the question of the cost would arise, in which J. S. Taylor's decision usually prevailed. Witness remembers distinctly one large item, —the liquors in the vats. J. E. Taylor had named two thousand dollars, and J. S. Taylor insisted that they should be put at three thousand dollars or three thousand, two hundred dollars, and they were finally put down at two thousand, six hundred dollars. That discussions were frequent. No figures were used until all parties were agreed. Discussions were usually opened by J. S. Taylor's contention that the amount named by J. E. Taylor usually was

too low. That there was a discussion of the leather in the vats and in the dry loft,—as to the method of taking it. Mr. Engeman contended that they should commence at the hides, and add to that the transportation, and cost of tanning up to the stage the leather was. J. S. Taylor contended that the amount should be fixed by taking the price of good leather at Philadelphia, and deducting from that figure the cost of transportation and of the tanning to the various stages at which the leather was. Taylor's contention prevailed, and the leather was inventoried in the manner he desired. The basis fixed was a statement by him of advices received from Massey & Janney, of Philadelphia (the firm's regular agents), that leather was selling for a certain sum per pound, which sum he named at twenty-five or twenty-six cents. That J. E. and J. S. Taylor agreed substantially as to the quality and amount of leather and hides on hand. They agreed that it was all good leather, and good liquors in the vats. William Engeman, aside from the contention of inventorying the leather, had but little to say, and left the amount to be placed in the inventory to J. E. and J. S. Taylor; frequently stating that he was not familiar with the business. Engeman was present when the Taylors had their discussion and made this statement as to the quality and value of the leather, hides, and liquors. That J. S. Taylor usually contended that the prices named by J. E. Taylor were less than cost, then a discussion would follow, some bill would be hunted up, and some record of money paid for the article in question, and the amount finally fixed would be the amount contended for by J. S. Taylor. That the only compromise figures of any size witness could remember was in case of the liquors. The absence of exact records in the books created a great deal of discussion. Witness stated that he had examined the books. They were started on the double-entry system, but he found no trial balances, which are the regular test of that system; found no regular continuous cash book; could get no trial balance of the books. That in fact the trial balance used on January 29, 1894, was a forced balance. That on the 1st day of April, 1893, the cash account in Ledger A, by pencil footing in that cash account, showed cash on hand over five hundred dollars, and when it was corrected and compared with the bank book there was

a shortage of over five hundred dollars. He found checks had been drawn and not charged to any account. That the books were closed January 29, 1894, a trial balance was gotten, and after correcting many errors, and without billing all the errors found, there was a difference in the two sides of the ledger of twenty dollars and ninety-one cents, which was entered in the profit and loss account of the ledger. After that, trial balance was made, and balance sheet was made, showing the assets and liabilities. That a profit of over $3,000 was shown by the statement, divided, and carried to the various partners' accounts, and entered to their respective credits in the books of the firm by the defendant J. S. Taylor, and it there showed that J. S. Taylor's interest in the business amounted to seventeen thousand, two hundred and forty-four dollars and thirty-five cents. That W. A. Engeman made J. S. Taylor the offer of that amount for his interest in the business. Recollected positively that J. S. Taylor said he would like to make it seventeen thousand, five hundred dollars even. That Engeman asked what was the difference, when witness told him it was two hundred and fifty-five dollars and sixty-five cents. That Engeman and J. E. Taylor went out of the room, and when they came back they said they had decided to give J. S. Taylor the bonus, and he heard no other price named or suggested by J. S. Taylor for his interest, other than seventeen thousand, five hundred dollars. When witness Jackson's attention was called to the fact that J. S. Taylor had testified that there was no partnership settlement of the affairs of Engeman & Taylors, he says: "So far as my recollection goes, the only open question was in regard to the liabilities of the tannery that had not been entered on the books." That he had always found in manufacturing business, that there were a number of outstanding bills not rendered by the parties, and therefore no complete list of liabilities could be made. "They were supposed to be small, and there was some talk between Mr. Engeman and J. S. Taylor on that point, and Mr. J. S. Taylor stated that he was willing to pay his proportion of any such liabilities. That was the only unsettled point that I remembered." Witness further says that in said sum of seventeen thousand, two hundred and forty-four dollars and thirty-five cents was J. S. Taylor's propor-

tion of the profits, "and in making up these figures J. S. Taylor and myself were busy for at least a week, and every figure connected with it J. S. Taylor was thoroughly familiar with, and in fact he knew how much profit the list of assets and liabilities would show before Engeman did, for we had arrived at those figures in the afternoon, and I gave them to Mr. Engeman that night at supper." Witness states that J. S. Taylor knew before the inventory was completed the amount it would have to reach to show a profit. He also states that at the time of making and completing the inventory he heard nothing against its being the basis on which J. S. Taylor's interest in the business was to be ascertained.

It is insisted by appellee that, in making the purchase of his interest in the firm, the appellant and J. E. Taylor were acting for themselves, while he was acting for himself, and the parties were "dealing at arm's length"; that the purchasers were striving to buy at as low a rate as possible, while the seller was trying to get the best price he could, and their relations were as those of strangers to each other, because appellant wanted appellee out of the firm. They were partners. Appellee and his brother, J. E. Taylor, had been the active, working partners, in complete control of the business,—a business in which appellant, the third partner, had absolutely no experience, no knowledge, resident in a distant city, giving no attention to the business; and, because of the experience of the other members of the firm, it was provided in the contract that he should not be required to give it attention; and when it came to ascertaining the assets of the firm, to know what the value of the interest of the several partners was, the appellant was without knowledge and without experience, and could have but little idea of the values and condition of the assets, and necessarily had to rely upon the judgment of his skilled and experienced partners; and nothing could be more natural, because of their peculiar relations, than that he would expect a fair valuation of all the assets,— especially of those of which, because of inexperience, he was unable to make an intelligent estimate. His partner in the new firm purchasing was a brother of the old partner, whose interest they were purchasing. So that, while he felt sure his new partner would not attempt to over-

reach his brother, he would at least fairly protect his own interests, which were identical with those of appellant; hence he felt safe in relying upon the judgment of his partners to arrive at a just valuation. According to witness Jackson and himself, appellant entered very little into the discussion as to prices and valuations, but suggested and contended for a mode of estimating the value of the hides in the vats in process of tanning, which was to commence at the hides and add to that the transportation and cost of tanning up to the stage at which they were, while appellee contended that the amount should be fixed by taking the price of good leather at Philadelphia, and deducting from that the cost of transportation, and of the tanning back to the various stages at which the hides were in the vats; and, singularly enough, the latter mode prevailed, and the price of leather fixed at 26 cents per pound in Philadelphia, and it was upon this basis that the valuation of all the hides in process of tanning at the time of taking the inventory was fixed. By this means all the hides in the vats were estimated as first class hides. When estimating the value, appellee represented that he had a letter from Massey & Janney, the firm's agent in Philadelphia, that their best leather was selling at twenty-six cents per pound; but it is claimed, and so testified to by witness Jackson and others, that he did not produce the letter, while he insists that he did. When a copy of the letter was afterwards obtained, it was found to state, "We sold, as you will notice in the account, a sample of the new leather at twenty-six cents per pound." The sample consisted of two backs which sold for seven dollars and eighty cents,—at twenty-six cents. It is very clear, if that letter had been produced, the leather would not have been priced at twenty-six cents per pound, based upon the information contained in the letter, which says: "The prices obtained on the account were almost altogether for the old and undesirable stock. The new stock that has come in last is very much better, and we have not sold any of it except at better prices. We sold, as you will notice on the account, a sample of the new leather at twenty-six cents per pound. We want you to know that the 19 and 20 cent sales were only for the old and poorest of the stock." Of course, the sample was the choice of the leather, while Drayton, of

the firm of Massey & Janney, testifies that three-fifths of
the leather sent after January 27, 1894, was damaged, and
yet J. S. Taylor testifies that: "This letter, of course, led
me to believe that the leather was bringing 26 cents. J.
E. Taylor spoke of some damaged leather being in the
yard or loft, and I remarked that the leather would aver-
age with past shipments of leather, so J. E. Taylor and W.
A. Engeman counted the leather that was on hands at Mas-
sey & Janney's at 24 cents. They thought that two cents
would cover all expenses." Appellee, in his answer, says
that in estimating values, quantities, etc., all the parties
had the same information before them upon which to base
their estimates, and says that the said inventory was a
just and correct valuation of the bark; that the valuation
put on the hides and leather in the inventory was just and
fair; that in estimating the value of the liquor there was
no actual measurement of the quantity and strength of
the same, and proceeds to show how the estimate was
made; that all parties had the same facts in their posses-
sion, and had equal opportunities to ascertain the value
of same, and that the value of the liquors as shown by the
inventory was a just and fair one; that in making up said
inventory, and all the items therein contained, there was no
concealment, or false or fraudulent representation, on his
part, to increase the valuation, and that all the facts in
his possession as to quantity, quality, and value of the
items in said inventory were in the possession of all the
parties, and in fact the inventory was taken only for the
purpose of aiding parties to arrive at a valuation of all
the assets and liabilities of said firm, but denies that it was
mutually agreed that his interest in said firm was to be
ascertained by taking said inventory of the assets and lia-
bilities of said firm, as charged in the bill, and avers that
in taking said inventory William A. Engeman and J. E.
Taylor were acting together for themselves, in putting a
calculation upon the various items, and respondent was
acting for himself, and yet he insists in his testimony that
he had nothing to do with making the inventory, and it
mattered not to him at what price they valued the various
items it contained. But his own testimony is contradic-
tory on that point in many particulars, where it shows
that he manifested a lively interest in the valuation of items

going into the inventory. And he is also contradicted by the sworn answer of J. E. Taylor, which says "that the inventory was made up by and with the assistance and agreement of all the parties, but chiefly by respondent and plaintiff, for the purpose of arriving at a just and correct valuation of the assets and liabilities of said firm," and in his testimony he states that the inventory was made "for the purpose of ascertaining what W. A. Engeman and myself were to pay J. S. Taylor for his interest in this business." It is true that on cross-examination J. E. Taylor squarely contradicts his sworn answer, and says that all the parties did not agree to said inventory and the valuations fixed therein, and that he did not think the said inventory had any connection or anything to do with the said sale of January 29, 1894; and again, on cross-examination, he was asked, "How and by whom was the leather inventoried and valued?" Answer: "As near as I can remember, W. A. Engeman, J. S. Taylor, and myself all had something to do with it; with the leather here at the tannery. * * * We estimated that this leather would bring 13 pounds to the back, and we put the bellies at 4 pounds. We estimated that this leather was worth 25 cents per pound for the backs, less the tanning, finishing, transportation, commissions, etc. We estimated the bellies at eight cents per pound." Appellant testifies that the inventory filed with the bill was agreed upon by all the firm,—J. E. Taylor, J. S. Taylor, and himself; that, when the inventory and valuation of all the assets of the firm were completed, from this was deducted the debts, and it was found that the balance remaining was a greater amount than the capital paid in by all the parties, which showed that they still had all the original capital, and had made a profit, which profit was divided at one-fourth each to J. E. and J. S. Taylor, and one-half to Engeman. He says the inventory was made because it was the only way they could ascertain what the interest of each party was, and whether there had been a profit or loss, and in order to fix the value of J. S. Taylor's interest so he could retire from the firm; that the figures were all gone over by the three partners together, and valuations fixed—the value of the bark on hand and the amount of it was fixed—by J. E. and J. S. Taylor; that he agreed to the price per ton for the bark, but knew noth-

ing of the quantity; that J. S. Taylor made statements that ascertain the number of tons of bark had been purchased, and J. E. and J. S. T aylor together made an estimate of the number of tons that had been used, and reported to him that there were three thousand, two hundred tons on hand; that J. E. Taylor told him that the tannery was full of strong, rich liquors, including the empty vats that had no hides in them, and that all the liquors in the tannery were worth and had cost over three thousand dollars, and that he thought J. S. Taylor would agree to a lower valuation than that amount; that they were finally valued at two thousand, six hundred dollars, both J. E. and J. S. Taylor declaring to him that that was less than their cost and value; that the value of the hides and leather was fixed after he had made a list of them from statements of J. E. and J. S. Taylor, and the value was fixed by all three partners together; that J. E. and J. S. Taylor both stated that all the hides which had been worked into the tannery and into the leather then in the tannery were first-class, as they had used a poor hide the first year or so after the tannery was built; that J. S. Taylor said he had a recent letter from Massey & Janney, which he could not find at that moment, and that they had written to him that they were getting 26 cents for "our No. 1 backs," and that they were nearly all tanned, and could soon be finished and shipped to market, and that the backs should be valued at twenty-six cents, less two cents for commission and discount, and estimating what the cost would be for finishing them, and deducting that from the twenty-four cents remaining, after allowing for commission and discount; that he finally agreed to the valuations fixed in the inventory, after being privately urged by J. E. Taylor to agree to same, as he believed he had made a somewhat better weight than had been estimated; that in agreeing to the values fixed upon the property as set forth in the inventory, and quantity and quality of the hides and leather, liquor, and bark, he relied upon the representations and statements of J. E. and J. S. Taylor, his then partners, and also upon the fact that one brother was retiring and the other remaining in the firm, and their interests were opposite, and any valuation they would both agree upon would be fair and just;

that he knew nothing of the tanning business, except that J. E. and J. S. Taylor had told him that in manufacturing the leather for Charles A. Scheiren & Co. they made very low profit, if any, at the price they received; that he knew nothing of the price of leather in the different stages of manufacturing, nor as to the value of liquors, nor as to the number of cubic feet of bark per ton when ricked; that the values as put down on the list, as finally decided upon, were put down when all parties were together; that he had no knowledge of the cost of the buildings, except from statements of J. E. and J. S. Taylor. Something was said about trying to get at the cost of the buildings from the books, but J. S. Taylor said that it could not be done; that he had tried to do it, and had to give it up. Appellant states that while making the inventory they were figuring a great deal on scraps of paper,—J. S .Taylor in particular,—as they went along, to see how they were going to come out. The leather and hides were invoiced at a little over sixty thousand dollars, and sold for something over forty-one thousand dollars, a loss of nineteen thousand dollars, and appellee claims that this loss was in consequence of the decline in the market.

Henry E. Drayton, a witness, and member of the firm of Massey & Janney, merchants of Philadelphia, agents of Engeman & Taylors for selling their leather, states that the leather received from the tannery after January 27, 1894, was poor; that it was made from an inferior class of hides, and was poorly prepared for the market; that about three-fifths of the leather received after January 27, 1894, was poor or damaged leather, and the remaining two-fifths was of poor quality, of a low grade of No. 1 and 2 leather; of nine thousand, nine hundred and seventy-nine backs received after January 27, and inspected, four thousand, eighty-five were graded as good, five thousand,eight hundred and ninety-four were graded as damaged; one hundred and fifty-five buts graded as good, eleven as damaged, fourteen sides rough slaughter leather good, six damaged. The report of the sales shows these backs to have sold for prices ranging principally from eighteen to twenty-one cents, some for twenty-two, and a few for twenty-three, cents.

C. C. Cookus, witness, was employed at the tannery from April, 1893, to September, 1894. Knew of damaged hides

being received at the tannery in the summer of 1893,—a great many of them. Could not give the number. Some of them were soiled so that the grain slipped off while working. Some were cut on the flesh. They were what he would consider a second-class hide. In a convensation between J. E. and J. S. Taylor and witness in the beam shop, J. E. Taylor stated that said hides were a little off, but he bought them because they were cheap. That J. S. Taylor remarked that they were d——d dear as a gift. That at the time part of the hides were on the floor before them, and part in the beam shop. When asked where they were on January 27 and 29, 1894, he said he supposed they were in the lay-away vats, because they had not been drawn and shipped away. "Q. What was your reason for thinking they had not been drawn and shipped away? A. Well, as I said before, the hides were damaged, and the damaged leather had not been withdrawn at the time,—at least, not so much of it as was drawn afterwards." Says he saw the leather that was in the vats January 29, 1894, after it was taken out. Part of it was badly damaged. The grain was off of some of it, and some had white spots or blotches over it, owing to the condition of the hides when they went in. On cross-examination he says it is a fact that the hands all knew of the damaged hides. It was talked of by the parties connected with the tannery, but he did not hear it talked of in connection with the inventory. He further states J. E. Taylor told him (he thinks it was the next day after the sale) that he had bought,—that the sale had been made; "and I asked him the question what he did—or how he fixed it—about the damaged leather, and he remarked that he did not do anything. I simply replied that there would be something done about it." This conversation is not denied by J. E. Taylor.

M. S. Henkle testified that he was at the tannery on the 27th and 29th of January, 1894; that J. S. Taylor, J. E. Taylor, and W. A. Engeman were taking an inventory of the property for the purpose of Summer (J. S. Taylor) selling to John Ed and W. A. Engeman; that during the inventory he heard J. S. Taylor tell Mr. Engeman, on a good many occasions, they were putting in the buildings at cost and below cost, and that there was a lot of stuff in the tanyard they could not see, and also at the leach house, and

it was hard to get at the cost, and heard J. S. Taylor tell Mr. Engeman that the hides they had on hand and the leather in the vats was good, heavy leather and good hides; that they had light and indifferent hides at the beginning but they were worked out; and heard J. S. Taylor tell Mr. Engeman that the tannery was full of good rich liquors, and they were really putting it below cost.

E. Haupt, a tanner of large experience, was employed at the tannery on the 8th of February, 1894. Testifies that the hides and leather in the tannery at the time he was employed were not first class. In the first place, they were not good hides: secondly, they were damaged a good deal, and they could not make first-class leather out of damaged hides. When asked in what way the hides in process of tanning and the leather were damaged, said they were cheap hides; they could be damaged in the hide before they got them, and then they could be damaged in the soaks (water), and could be damaged in the bait, but could not be damaged well in the grain after put in the liquor. These hides were grain-broken,—some of them the grain came off. The grain does not come off at all in tanning. It comes off in the beam shop. The grain could be black in tanning, so that it could not be first class leather for the market.

A large lot of hides, known as the "Dayton hides" or ———, etc., hides, which one of the witnesses (Cookus) says J. E. Taylor said were a little off, but he bought them because he thought they were cheap, and which J. S. Taylor said were d——d dear as a gift, were laid down in the tan in the summer of 1893, and should have been drawn and finished and placed upon the market in the late fall of that year, while it appears the hides laid down in May, June and July, 1893, were not drawn until February, March, and April, 1894, the greater part of them in April, from nine to ten months for tanning, while it is shown that hides laid down in October, 1893, were drawn in February and March, 1894, being four or five months in tanning. J. E. Taylor testifies that (at the time of taking the inventory). "We had on hand at that time an unusual amount of strong liquor, from the fact that near about all the leather in the yard was tanned, and had been relayed in extra strong liquors." Now, here was leather that had been

laid down in May, June. and July before, all tanned and ready for the finish and market, and should have been drawn and finished in October, November, and December, and put upon the market, which would have given it the full time of five months for tanning, and the evidence is that four to five months is the time required, and there is no dispute as to the firm being in "great straits" for funds, yet this leather is kept in the vats quite double the length of time required for its tanning. There must have been an object in so keeping it in. And there is scarcely a conceivable explanation of their action in harmony with just and fair dealing, by keeping these inferior and damaged hides in the vats. The fact could be kept from the knowledge of their inexperienced partner, with whom it had been understood since the previous September that they were to deal as a purchaser of the interest of J. S. Taylor; and it is a singular fact that in taking the inventory, while there was an apparent contention between J. E. and J. S. Taylor, the only partners who were familiar with the business, J. E. Taylor, the purchasing partner, contending for a low estimate, and J. S. Taylor, the seller, contending for a high estimate, the latter was fortunate enough to convince the former, who would yield to the higher estimate. These hides had lain there several months after being completely tanned, and the financial interests of the firm suffering for the proceeds thereof. J. E. Taylor himself testifies that "near about all the leather in the yard was tanned, and had been relayed in extra strong liquor," when it should have been finished and placed on the market to relieve the firm of its financial embarrassments. At the time of the purchase of the interest of J. S. Taylor the new firm of Engeman & Taylor was formed, composed of J. E. Taylor and W. A. Engeman; and, under their contract of co-partnership, Engeman was the partner whose duty it was to buy hides and sell leather and attend to the finances of the firm, which was in pressing need of a large amount of money to relieve it of the old debts it had assumed, and to buy stock for the business; and he urged his partner, J. E. Taylor, to finish the leather and get it on the market, and under date of February 8, 1894, writes Taylor, "You see the man that can help us out of this hole by getting a lively move on that tanned

stock you have laying in the vats doing no good," while he drew out and finished in February and March, 1894, hides that were laid down in September and October,—mostly in October. The most of the hides laid down in the previous June and July were not drawn until in April, 1894,—evidently an effort to keep them off the market as long as possible. On the 17th of May, 1894, the inspector's report showed a shipment on May 5th of eight hundred oak backs, of which four hundred and seventy-seven were damaged; and May 19th, shipment May 10th of five hundred and ninety-three scoured oak backs, of which four hundred and fifty-five were damaged; and shipment on May 24th of three hundred and eighty-five scoured oak backs, of which two hundred and ninety-three were damaged; shipment on June 2d of four hundred and ninety-five scoured oak backs, of which three hundred and seventy-six were damaged. And on the 24th of May Massey & Janney write: "It is too bad that such a very large proportion of the leather coming in is damaged, some of it badly, but all of it damaged; leaving but very small proportion of good leather." The fact of a large quantity of inferior and damaged hides being in the vats was known to both the Taylors, and to all the employes of the tannery who had anything to do with the hides or leather. Besides the witnesses on this point already mentioned, William Newhouse says he hauled the leather to Romney, and would bring back hides for Engeman & Taylors; that in June and July, 1893, he hauled hides for them; that he hauled some pretty bad hides for them. "I mean hides that smell bad. The hair would come out of some of them when we would pick them up." He thinks there were two car loads of bad hides. Heard J. E. Taylor say they were from Dayton, Ohio. J. S. Taylor weighed some of these hides, and William Cookus weighed some of them. Both the Messrs. Taylor were generally there when the hides were unloaded. Some of the leather he hauled from June, 1893, to January 27, 1894, was nice looking leather and some was not so nice-looking. Some of it had holes in it,—had kind of white looking streaks in it. Some of it looked like grease on leather, and looked scaled off, like. The grain was off. The leather he hauled after January 27, 1894, was in pretty bad condition. He stopped hauling about the last of May or 1st of June.

James Barger, witness, was employed at the tannery, knows of the two car loads of Dayton hides. Helped to unhair them. They were damaged right smart; the grain was slipped off. J. S. Taylor knew of their condition. He was in the beam shop, off and on when they were unhairing the hides. J. W. Gum, also employed there, knew of the Dayton hides. Says they were damaged to a great extent. When they worked them the grain slipped off. Thinks the Taylors knew of their damaged condition. Sol J. Shobe was employed in the tannery hoisting hides and laying them down in fresh liquor. The hides that were tanned for Scheiren & Co. were very good hides. As to the character of the other hides in the yard, thinks about half of them were damaged right smart, and that the Taylors knew of their condition. Mr. John Ed saw every pack that was brought up, and J. S. Taylor would come in not very often. Witness called J. S. Taylor's attention to one pack. There was no new liquor in the vats in which there was no leather at the time of the sale of J. S. Taylor's interest, that he knew of. Jacob V. Davis, working in the tannery since April, 1893: At time of sale there were ten or fifteen vats that had no leather in them. They had sour liquor in them. Of the Engeman & Taylor stock of hides, there were eighty to the vat that had hides in them, and ninety of the Scheiren stock. The Scheiren stock was in good condition,— good hides. The Engeman & Taylors stock was pretty badly damaged; thinks something like half of it damaged. Grain was off in spots and flesh cut in some of it. Thinks J. S. Taylor knew of its condition, as he was there sometimes when they were handling it. Saw the lot of hides they said came from Dayton. They seemed to be in a rotten condition. The grain would slip off of them when they were unhairing them. When asked whether they worked in any other damaged hides while he was working there during the summer and fall of 1893, says the most of the hides in the yard were damaged stock, more or less. He did not know when it was worked in. Some of it was worked in before he went there.

It is insisted by appellee that appellant had the same information and was in possession of the same facts as the other parties, and was on the same footing in making the deal for the interest of the partner J. S. Taylor in the

firm; and he cites *Ludington* v. *Renick*, 7 W. Va. 273: "A party seeking the rescission of a contract on the grounds of misrepresentation must establish the same by clear and irrefragable evidence; and if it appears that he has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand, and his attention drawn to them, relief will be denied him." And from Justice Field in *Slaughter's Adm'r* v. *Gerson*, 13 Wall. 379, to the same effect. Even if it were true that appellant, as claimed by the defendants, had no confidence in J. S. Taylor, yet the interests of the other partner, the brother of J. S. Taylor, were identical with those of appellant, and, as well stated by appellant, he had a right to believe that, when the two brothers agreed on a matter in which their pecuniary interests were antagonistic, the conclusion would be about fair, at least according to their best judgment. Appellant had not the same information, neither was he in possession of the same facts, as the Taylors, under whose management and immediate supervision the tannery plant had been erected and equipped and managed in all its operations from the beginning. He was a non-resident, with no experience in the business, and, giving the business no personal attention, could know nothing about it, only as he could get information from the parties. J. S. Taylor says that appellant had this information and facts as charged, but he fails to show how he received it, or the circumstances under which he must have had it, while appellant disclaims all such knowledge or information. Attorneys for appellee admit the well-settled principle of law claimed by appellant concerning the good faith with which partners should deal with each other, and the fiduciary relation of a partner who has peculiar knowledge of the workings of the business of the partnership to the others, who have not such knowledge, and who may not exercise for his own benefit, and to the prejudice of the party to whom he stands in such relation, any of the powers or rights or any knowledge or any advantage of any description which he derives from such confidential relation; that "a false representation of a material fact constituting an inducement to the contract on which the purchaser had a right to rely is a ground for a

rescission of a contract, although the party making the representation was ignorant as to whether it was true or false, if the purchaser believes it to be true, and was misled by it in entering into the contract." But they contend that appellee was discharged from such fiduciary relation, and had a right to, and did deal at arm's length with appellant, and say that "commencing in August, 1893, with W. A. Engeman's fixed determination to get J. S. Taylor out of the business, followed by his employment of C. H. Cookus to take J. S. Taylor's place in the business without the knowledge or consent of J. S. Taylor, the correspondence between Engeman and J. E. Taylor about the withdrawal of J. S. Taylor from the firm, his visit to Massey & Janney before the sale, and his having T. M. Jackson at the tannery at the time of the sale to investigate the books, and last, but not least, the private conversation between Engeman and J. E. Taylor at the barn, stable, and in the tanyard, listing property and judging values, are conclusive evidence that they wanted to deal with J. S. Taylor at arm's length, and by their acts forever discharged him from any fiduciary obligation." The great weight of the testimony is that Engeman and J. E. Taylor consulted with J. S. Taylor before putting down values of articles listed, and they usually went down at the value contended for by J. S. Taylor, which was almost always, if not invariably, higher than the value contended for by J. E. Taylor. Witness Cookus states that he was employed by the firm, and not by Engeman,—and Engeman states the same thing,—and that he was not there in the interest of Engeman, and never reported to him. The fact that Engeman desired to have J. S. Taylor retired from the firm did not place them at arm's length in making the sale and purchase of the interest of J. S. Taylor in the firm, and Engeman alone was not purchasing the interest. If he had been the sole purchaser, he probably might have felt that he should be a little on his guard against misrepresentations on the part of the seller, but under the circumstances he evidently felt perfectly secure in relying upon the joint judgment of the two Taylors in arriving at a fair valuation of the assets of the firm.

It is insisted by appellees that appellant ratified the sale after he knew of the overvaluations in the inventory,

and is estopped from claiming a rescission of the contract. In *Davis* v. *Henry*, 4 W. Va. 571, where it was attempted to show that Davis, by a subsequent contract with Henry, had ratified the first, which was fraudulent, the court quotes with approval *Lord Erskine* in *Morse* v. *Royal*, 12 Ves. 371, who says: "As to the doctrine of confirmation, it stands upon several authorities that when a man, having been defrauded, with complete knowledge chooses to come again in contact with the person who defrauded him he abandons his right to abrogate the contract, and enters into a plain, distinct transaction of confirmation. But, when the original fraud is clearly established by circumstances not liable to doubt, a confirmation of such a transaction is so inconsistent with justice, so unnatural, so likely to be connected with fraud, that it ought to be watched with the utmost strictness, and to stand only upon the clearest evidence, as an act done with all the deliberation that ought to attend a transaction, the effect of which is to ratify that which in justice ought never to have taken place." And the court cites Sugd. Vend. pp. 287, 288, as affirming the same doctrine.

J. S. Taylor states that about April 18, 1894, he and Engeman were in a stage coach together, and Engeman told him that the leather would lose about twelve thousand dollars, and they talked about how business was, and everything, but Engeman did not ask him to make any of it up; that he told Engeman that he was very sorry that it would not bring the amount that he and J. E. Taylor had listed it at. This conversation Engeman denies, and says, "If J. S. Taylor had remarked that he was sorry the leather had not brought the amount that J. E. Taylor and 1 had listed it at, it certainly would have made a very strong impression on my mind," and says he did not know at that time of any overvaluation. W. C. Smith says he was in the stage with them, and heard Engeman, in the course of conversation with witness or some one else in the stage, refer to overvaluations. Does not remember the amount, but it was several thousand dollars. Whatever fears Engeman may have had about the leather falling short, they were allayed by his partner, J. E. Taylor, who wrote him February 12, 1894, that: "You will find that we are not hurt by the inventory of the stock. What backs are com-

ing out will average fifteen cents a pound." "You can say to them with safety that the stock that is to follow is better in every way than this lot." And on the 31st of May, 1894, he wrote Engeman: "We have all the old stock out and in the dry loft. I think it will run over the old inventory some." In April, 1894, Engeman got J. S. Taylor to extend the first large deferred payment on the sale from one year to two years, and on the 1st day of May wrote J. E. Taylor to "please explain to Summer (J. S.) why I can't send him any money," which acts and letters are claimed to be ratifications of the sale; but the assurances of his partner that they were not hurt by the inventory, and that the stock that was to follow was better in every way than that shipped, tended to allay his fears, and cause him to delay investigation, even if he suspected fraud, but there is no evidence that he did suspect it. It appears all through the transaction that he had the utmost confidence in J. E. Taylor up to the time that they entered upon this settlement, the 1st of July, 1894, when he was arranging to buy out the interest of J. E. Taylor. Then is when it first occurred to his mind that the Taylors had been acting in concert to overreach him in the deal with J. S. Taylor, and that J. E. Taylor was continuing the same course of conduct in selling to him his own interest. It appears very clearly that there was a studied effort upon the part of J. E. Taylor to keep back the principal part of the stock that was in the vats at the time of the sale, which was greatly damaged, and kept it several months off the market, when the financial interest of the firm was suffering for the proceeds of the stock which J. E. Taylor himself said was already tanned and lying there, to be finished and placed upon the market; and J. P. Hopple testifies that: "In July, 1894, J. E. Taylor came to the tannery, and said everything had depreciated since Summer sold out. Leather that was worth sixty thousand dollars when Summer sold out, had depreciated twelve thousand dollars. I said I did not believe it. 'If that is so, you have lost all you put in.' He said: 'No, no; Summer and I will come out all right.'" I am unable to find that J. E. Taylor denies that statement, although he was on the witness stand twice after Hopple's testimony. In *Wilson* v. *Carpenter's Adm'r*, 91 Va. 183, (21 S. E. 243), it is held: "Where the original contract is

tainted with fraud, its subsequent confirmation must be a solemn and deliberate act. If a waiver is relied on, it must appear that such waiver was distinctly made, with full knowledge of the rights intended to be waived, and the facts and the rights are known and intend- ed to be waived must plainly appear." And in the same place it is held that: "When the seller has made a false representation, which from its nature might induce the buyer to enter into the contract on the faith of it, it will be inferred that the buyer was thereby induced to contract; and, to remove this inference, the seller must prove either that the buyer had knowledge of the facts which showed the representations to be true, or that he expressly stated in terms, or showed by his conduct, that he did not rely upon the representation, but acted upon his own judgment. Nor is the buyer deprived of his right to relief because he had the means of discovering that the representation was false." See, also, *Iron Co.* v. *Sherman,* 20 Md. 117; *Montague's Adm'r* v. *Massey,* 76 Va. 307; *Linhart* v. *Foreman's Adm'r,* 77 Va. 540. "The injured party must assert his remedial rights with diligence, and without delay, upon becoming aware of the fraud. After he has obtained knowledge of the fraud, or has been informed of facts and circumstances from which such knowledge would be imputed to him, a delay in instituting judicial proceedings for relief, although for a less period than that prescribed by the statute of lim- itations, may be, and generally will be, regarded as an ac- quiescence; and this may be, and generally will be, a bar to any equitable remedy. To this rule there is one limita- tion. It applies only when the fraud is known, or ought to have been known. No lapse of time, no delay in bring- ing a suit, however long, will defeat the remedy, provided the injured party was during all this interval ignorant of the fraud. The duty to commence proceedings can arise only upon his discovery of the fraud, and the possible ef- fect of his laches will begin to operate only from that time." 2 Pom. Eq. Jur. section 917. "Any contract, the making of which is induced by fraud of either party, practiced upon the other at the time the contract is made, or while nego- tiations in regard to it are being carried on, is voidable, and may be rescinded at the election of the party defraud- ed. This is the most frequent ground for rescission, and

may consist either of false representations or fraudulent
concealment in respect to the subject-matter of the con-
tract." 21 Am. & Eng. Enc. Law (1st Ed.) 27, and cases
therein cited. In *Wilson* v. *Carpenter's Adm'r supra:* "The
court does not inquire with any care into the extent of the
prejudice. It is sufficient if the party misled has been
slightly prejudiced,—if the amount is at all appreciable."
2 Pom. Eq. Jur. section 890. In *Reynell* v. *Sprye*, 8 Hare,
222, it is held that, where the plaintiff has been induced
to make a conveyance of property by a false misrepresent-
ation, it was not an objection to setting aside the convey-
ance that the plaintiff had, throughout, the means, equally
with the defendant, of knowing what his rights were, and
of obtaining competent advice respecting them.

Appellees claim that there should be no rescission,
because the status quo cannot be restored. In *Brown* v.
*Norman*, 65 Miss. 369, 4 South. 293, Norman, in October,
1885, induced by false and fraudulent misrepresentations
of Brown and Mangum, two members of the firm, to buy
Brown's interest in the partnership, which was insolvent,
giving in exchange therefor his farm and the personal prop-
erty thereon, made a deed conveying the property, and paid
the residue in cash, and assumed in addition thereto liabil-
ity for the existing debts of the firm. In March, 1886, Man-
gum, at the instance of the creditors of the old firm, filed
his bill for the dissolution of the firm and administration
of the assets, on the ground of the insolvency of said old
firm. On his petition a receiver was appointed. In Au-
gust, more than five months after the appointment of the
receiver, Norman filed his bill to rescind the sale and recov-
er back his land. Relief was granted him, and Brown ap-
pealed. In rendering the opinion affirming the decree, the
court says: "It will be noticed that the objections to the
relief asked resolve themselves into two classes: (1) That
there can be no recission because the status quo cannot be
restored; and (2) that the conduct of the complainant after
he knew or should have known of the fraud is, in law, a
ratification of the contract. In decisions in actions at law
arising from attempted rescissions of contracts for the sale
or exchange of personal property, the language of the court
is almost uniform in declaring that the defrauded party,
in order to maintain his suit, must have restored or ten-
dered in restoration whatever was received by him under

the contract, because of the principle that the contract must be rescinded in toto, if at all; the plaintiff not being permitted to retain a benefit under an indivisible contract, which he repudiates. But even in actions at law there are exceptions to the rule. If the thing received by the defrauded party be of no value (*Fitz* v. *Bynum*, 55 Cal. 459), or if by reason of the act of the fraudulent party a return be rendered impossible (*Masson* v. *Bovet*, 1 Denio, 69, 43 Am. Dec. 651, and notes; *Hammond* v. *Pennock*, 61 N. Y. 155), a return or tender is unnecessary. So, also, where by natural causes or reasonable use the value of the property is diminished, and perhaps where it is necessarily destroyed in discovering the fraud, the fraudulent party must receive it in its depreciated condition. *Baker* v. *Lever*, 67 N. Y. 304; *Gatling* v. *Newell*, 9 Ind. 574. And if the *bona fide*, buyer has expended work, money, or material in the improvement of the property before discovering the fraud, he may restore the property, and recover for the work and labor, money or material, put upon it. *Farris* v. *Ware*, 60 Me. 482. In the two latter classes of cases there is a restitution of the thing itself to the fraudulent seller, but the status quo is not restored; for in one case he receives the property back less valuable than it was, and in the other he takes it improved in value, but possibly improved in a manner or to an extent he could not have desired, but he is nevertheless chargeable with the value of improvement."

But in equity the complainant does not necessarily rescind and sue; he may sue for rescission. He is required to restore the consideration, not, however, as a condition of acquiring the right to sue, but because of the equitable maxim that he who seeks equity must do equity. Mr. Pomeroy thus states the rule: "In administering these remedies, pecuniary as well as equitable, the fundamental theory upon which equity acts is that of restoration,—of restoring the defrauded party primarily, and the fraudulent party as a necessary incident, to the positions they occupied before the fraud was committed. Assuming that the transaction ought not to have taken place, the court proceeds as though it had not taken place, and returns the parties to that situation. Even in such cases the court applies the Maxim, 'He who seeks equity must do equity,'

and will thus secure to the wrong-doer, in awarding its relief, whatever is justly and equitably due." 2 Pom. Eq. Jur. section 910. In *Neblett* v. *MacFarland*, 92 U. S. 101, it is said: "The court proceeds on the principle that, as the transaction ought never to have taken place, the parties are to be placed, as far as possible, in the situation in which they would have stood if there had never been any such transaction." Other writers upon equity jurisprudence deduced the right of the defendant to have restoration of his property from the maxim of equity that imposes doing equity upon the complainant as a condition upon which he secures relief. Adams, Eq. 191; Story, Eq. Jur. section 693.

Let us now refer to cases in which the specific question has been raised, and passed on by courts of equity. In *Barker* v. *Walters*, 8 Beav. 92, and *Jarvis* v. *Berridge*, 8 Ch. App. 351, demurrers had been interposed to bills seeking rescission, on the ground that no offer was made to restore the status quo. It was held that it was unnecessary to do so, since the court on final hearing could require the complainant to do equity. In the latter case Lord Shelburne said: "Upon principle there appears to be no good reason why a plaintiff in equity, suing upon equitable grounds, should be required on the face of his bill to submit to those terms which the court, after hearing, may think it right to impose as the price of any relief to which he may be entitled." In *Myrick* v. *Jacks*, 33 Ark. 425, the court said: "It is no objection that complainant cannot put Jacks entirely in *statu quo* on rescission. The change in condition of the property was brought about by persuasion to accomplish a transaction in which Jacks was a party, and before the fraud was discovered, and by the action of complainant in a matter she did not understand. When courts cannot place parties wholly in *statu quo*, they are not thereby precluded from granting relief against fraud. They may proceed to do so as nearly as possible, and make compensation." See, also, *Gailing* v. *Newell*, 9 Ind. 574; *Crosland*, v. Hall, 33 N. J. Eq. 111. Upon principle and authority, we think it immaterial that the *status quo* cannot be literally restored.

Nor do we think the record discloses ratification by inaction. The complainant owed the defendant no duty to

investigate the condition of the firm. He had the right to rely upon the truth of the representations made by the defendant, and all that was required was that he should act when he discovered the fraud of which he was the victim. In *Rawlins* v. *Wickham*. 3 De Gex & J. 304, the complainant had been inveigled into an insolvent co-partnership by false representations of its condition, and acted as a partner for five years, and then, having discovered the fraud, exhibited his bill for a rescission and for an account; and his right to rescind was upheld. See, also, *Swith's Admr's* v. *Smith*, 30 Vt. 139, which was an action at law successfully defended by the party defrauded, founded on facts strikingly similar to those involved here. It is held both at law and in equity that delay alone before the discovery of the fraud will not bar the right to rescind. Note to *Bryant* v. *Isburgh*, 74 Am. Dec. 655, 13 Gray, 607. In *Pence* v. *Langdon*, 99 U. S. 578, it is said: "Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms impart this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it has been committed. Current suspicion and rumor are not enough. There must be knowledge of the facts which will enable the party to take effectual action. Nothing short of this will do. But he may not willfully shut his eyes to what he might readily and ought to have known. * * * The burden of proving knowledge of the fraud and the time of its discovery rests upon the defendant." See, also, *Baker* v. *Lever*, 67 N. Y. 304; *Brown* v. *Post*, 1 Hun, 303; *Baker* v. *Spencer*, 47 N. Y. 562; 2 Pom. Eq. Jur. section 917, note 2; *Thurston* v. *Blanchard*, 33 Am. Dec. 705, note.

The principles of the cross assignments of error have been considered in the treatment of the question arising in the case, and, if my view of the evidence and circumstances of the case is correct, the said assignments are not sustained. The circuit court did not pass upon the evidence touching the valuation of the buildings and bark, and does not intimate how the court regarded the evidence relating to the items of leather and liquors as to which it ascertained there were overvaluations, but that there were overvaluations in those items, especially that of the leather, to an unconscionable extent, and concealment of the true condi-

tion of the leather and hides in the vats at the time of the sale, for fraudulent purposes, there can be no doubt; and I fail to see in what aspect of the case the court could hold that the overvaluations were the result of mutual mistake of the parties, which is the only ground upon which the court could properly restrict plaintiff's relief to abatement for overvaluations. The court erred in not setting aside the sale. The decision should be reversed, and the cause remanded for further proceedings to be had therein according to the principles of equity.

*Reversed.*